## APPLEGARTH *v.* APPLEGARTH

[No. 258, September Term, 1964.]

*Decided May 27, 1965.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, HORNEY, MARBURY and SYBERT, JJ.

*Ronald A. Willoner* for appellant.

*John F. King,* with whom were *Arthur K. Crocker* and *Anderson, Coe & King* on the brief, for appellee.

Sybert, J., delivered the opinion of the Court.

The Chancellor granted Harriet S. Applegarth an absolute divorce on the ground of abandonment, and her husband, Harold G. Applegarth, appeals, claiming that the evidence did not establish abandonment; that there was a lack of corroboration of the wife's testimony; and that the evidence shows a bona fide effort on his part to reconcile.

The parties were married in 1949 and the record reveals no real marital difficulties until 1961. They purchased and moved into a house on Bolton Street in Baltimore in 1957. Having no children of their own, they adopted a boy and a girl, now ten and five years of age, respectively. They apparently lived in comfortable circumstances, and Mrs. Applegarth had a housemaid. Mr. Applegarth, an attorney, was connected with two savings and loan associations which encountered financial difficulties in 1961 and were placed in receivership in January 1962. In July 1962, Mr. Applegarth was convicted by a federal court of mail fraud in connection with the associations, was sentenced to a federal prison in November 1962, and was released on parole in September 1963.

The marital discord between the parties appears to have commenced when the difficulties of the building associations began. At that time most of the husband's income ceased, and, according to him, he borrowed several thousands of dollars from his father to resist the receivership actions and to defend the criminal charges against him. The evidence indicates that both parties were upset and "edgy" as a result of the situation.

Mrs. Applegarth testified that sometime around Christmas, 1961, she and her husband had an argument during which she upbraided him "at some length" and "perhaps excitedly" about his dishonest friends in the savings and loan business and which ended with his throwing her to the floor and kicking her; that she ran out of the house, breaking the glass door with her hands, but returned at once. Her husband went across the street to a neighbor's house to get assistance for her cut hands. The neighbor, Mrs. Ward, then came over to the Applegarth home to render aid. The wife stated that earlier in the evening another neighbor, Mr. Greenhood, had been with her but that he

was not present at the time of the argument since he had left when her husband came home, though he returned when Mrs. Ward came over.

The husband's version of the occurrence differed in important respects from that of his wife. According to him, he came home from work at 11:00 P.M., tired and nervous, to find several neighbors visiting his wife, and they all had some drinks. The visitors soon left, except Mr. Greenhood, whom, the husband stated, he found in his home too frequently. When the wife began an argument about his connection with the savings association business, the husband said he ordered Greenhood out of the house and his wife upstairs. Greenhood left, but the wife continued the "tirade" and became hysterical, whereupon he slapped her several times to bring her out of it. She fell to the floor and resisted his efforts to help her up, he said, but then she suddenly jumped up and ran out the door, pushing her hands through the glass and cutting them. She then came back in and ran upstairs, after which he went across the street and brought Mrs. Ward over to aid his wife. Greenhood also came back in the house. The husband denied that he had thrown his wife to the floor or kicked her.

Mrs. Applegarth made no claim that her husband had been physically violent toward her, other than the episode mentioned.

The desertion of her by her husband occurred, Mrs. Applegarth testified, on February 11, 1962, when he packed some suitcases and left the house after merely telling her that he was going to Florida without stating any reason. She said the only reason she could give as to why he left was because of her poor health. She testified that she was suffering from a skin disorder and a nervous condition which she thought was caused by worry over her husband's honesty and that she had seen a dermatologist and a psychiatrist. She stated that Mr. Applegarth left her little money and that her mother had to buy food for her within a few days of his departure. According to the wife, the parties never lived together as husband and wife after February 1962, though she stated that on one occasion he returned to Bolton Street, broke into the house, and slept in their son's room. She admitted that she had changed the lock on the

door, but could not remember whether it was before or after this occurrence. At first she testified that she didn't know where in Florida her husband had gone, but later she admitted that she had received several phone calls from him from Florida and that their son had visited him for several days there. And when the husband introduced in evidence certain letters which he claimed she had sent to him in Florida she admitted the letters were from her. She further testified that because her husband left her so little money she could not continue to keep the Bolton Street house and therefore had moved on June 1, 1962, to her parents' home in Easton, Maryland, though the record shows she retained the maid until she moved, and she admitted she had three tenants in the house until she left. The house was eventually sold under a mortgage though the record does not show when. She admitted that in September 1962 she wrote to her attorney asking him to get a court order so that her husband would stop "annoying" her. Her reason for doing this was, according to her testimony, because she was afraid of him and because "he drives me mentally out of my mind".

Mrs. Applegarth stated that she never received any money from her husband after he left (except $15 for the expense of traveling from Easton to Baltimore to see a psychiatrist) and that he never asked her to come to live with him. She did testify, however, that she visited a psychiatrist at her husband's request after he was released from prison and that once both she and her husband visited the psychiatrist together, but she said this was not because her husband wanted a reconciliation but because he wanted to annoy her. She couldn't remember whether or not he told the psychiatrist that he wanted her to come back and live with him. She said that she and her husband could never live together any longer; that life with him ruined her health and that her skin problem had disappeared since his absence.

The only witness called by the wife was the neighbor, Mrs. Ward, who corroborated Mrs. Applegarth's testimony in regard to the altercation around Christmas 1961 insofar as she had knowledge thereof after she arrived on the scene to calm the wife and clean her cut hands. She did testify that after February 1962 she "did not think" she saw Mr. Applegarth

around his home, though she was a frequent visitor, but did not know definitely whether he was ever there. She further stated that Mrs. Applegarth told her that her husband was in Florida. The other significant fact she testified to was that in June 1962 Mrs. Applegarth moved out.

The husband testified that he had no intention of ending the marriage when he left in February 1962, but that he went to Florida on a business trip and that he so told his wife when he left. He admitted that he did not give her an address, but this was because he did not know where he would be staying, and he said he gave her the telephone number of an attorney in Miami, where he could be reached. He stated that he returned to his Baltimore home after a week or so where he slept with his wife for a week though there were no marital relations due to her refusal. (One of the wife's subsequent letters to him in Florida refers to his week's visit to Baltimore.) He testified that he made several trips back and forth between Florida and Baltimore, most of which were evidenced by airline tickets. He stated that the first mention of separation was made by his wife by telephone to him when he was in Florida in March 1962, a few days after he was indicted for mail fraud. According to him, she was crying and hysterical and said she could not take it any longer and wanted a divorce. He further stated that he returned to Baltimore within two weeks but that his wife would not let him in the house, though she did allow him to take her to dinner, at which time she "asked for a divorce". He said he tried to persuade her to make a "go" of their marriage. On the next day he was able to see the children.

Mr. Applegarth stated that he was so emotionally disturbed during this time because of his marital troubles and his problems with the federal government that he went to a psychiatrist and asked his wife to do the same but she refused. He said she told him her mother was coming to Baltimore for Memorial Day and asked him not to come around. He testified that his wife left the Bolton Street house without telling him though he had been there on the morning of the day on which she moved. According to him, he visited the appellee and the children several times in Easton after he learned where they were, and made

attempts to reconcile though he continued to live in the Bolton Street house until November 1962 when he went to prison.

The husband testified that from January to April 1962 he had income of $236 per month from a previous business deal and that he gave all of this to his wife. He also said that before he went to Florida in February 1962 he gave her $500 from the money he had borrowed from his father, and that when he came back about a week later he thought he gave her $100 or $150. He further stated that later, while still in Florida, he sent money to her through a Mr. Schulman. Mr. Schulman took the stand and corroborated this, stating he thought the amount was $500. In addition, the wife sold an automobile titled in both names and forwarded the check for the $500 purchase price to her husband in Florida. He endorsed the check and returned it to her. Her letter forwarding the check and requesting his endorsement is in the record.

In addition to his attempts to effect a reconciliation before he went to prison, the husband described several such attempts after his release, including a joint visit with his wife to a psychiatrist during which she said she would not consider any kind of reconciliation.

If the wife's version of what occurred during the altercation between the parties around Christmas, 1961, be accepted, the single act of violence complained of by her does not measure up to what the law of this State requires as constituting a justification for the wife's living apart from her husband. As was pointed out in *Harrison v. Harrison*, 223 Md. 422, 164 A. 2d 901 (1960), a constructive desertion case, a single act of violence, in order to constitute cruelty of treatment, "must indicate an intention to do serious bodily harm, or be of such a nature as to threaten serious danger in the future." (p. 426 of 223 Md.) Neither of those elements was present here.

But the case before us is not one in which the wife seeks to justify her departure from the marital abode by claiming constructive desertion by reason of cruelty on the part of the husband. Rather, the wife here sought an absolute divorce on the ground that her husband abandoned and deserted her in February 1962 when he went to Florida. The Chancellor, in granting a divorce to the wife, found as facts that after the husband's trip to Florida in February 1962, "there had been several dis-

cussions after the separation about a divorce, the divorce being requested by Mrs. Applegarth, that he [the husband] refused and still refuses to consider any such action." The Chancellor made no finding that the husband, when he went to Florida or thereafter, had an intention to terminate the marriage relation, but he did conclude that the husband's efforts for reconciliation were not *bona fide* because he had not rented a home or apartment and asked his wife and children to come and live with him, and offered to support them.

The Chancellor's findings do not, in our view, support the award of a divorce to the wife. We think it is clear from the evidence, as the Chancellor found, that it was the wife, and not the husband, who desired a divorce, and that he consistently opposed such action. This record indicates, we believe, that the wife became embarrassed and disturbed by the failure of her husband's savings and loan associations and the attendant publicity and failure of income. It would appear that she formed a desire to end the marriage, which ripened to intention to do so when her husband was indicted on criminal charges. She articulated this intention in the telephone conversation with her husband in March 1962, which is the first time the record shows that either party mentioned divorce. Apparently the determination to charge the husband with abandonment as of February 1962, when he left for Florida, was an afterthought, as her letters to him there did not indicate that she thought he had deserted her, and did not so charge. On the whole, the evidence shows that the husband tried many times to reconcile, but that the wife desired a divorce and wanted him to keep away from her.

We have often said that the moving party in a divorce action charging desertion must prove, *inter alia*, that the offending party had the intention to desert, *i.e.*, the intention that the marriage relation shall no longer exist. *Zulauf v. Zulauf*, 218 Md. 99, 145 A. 2d 414 (1958), and cases cited; *Smoot v. Smoot*, 200 Md. 216, 88 A. 2d 465 (1952). Here the wife, as complainant, did not sustain the burden of proof. The Chancellor could not fairly conclude, from the evidence offered, that the husband ever had the requisite intent to end the marital relation. And, in any event, the testimony of the witness called by the wife to corroborate her testimony as to the ending of

cohabitation and intention on the part of the husband to desert fell far short of what is required. *Taylor v. Taylor,* 238 Md. 312, 208 A. 2d 685 (1965) ; *Comulada v. Comulada,* 234 Md. 287, 199 A. 2d 197 (1964).

In view of our decision that the husband was not the offending party, we do not need to consider the *bona fides* of the husband's efforts to reconcile.

We hold that the Chancellor was wrong when he granted the wife an absolute divorce and reserved the right to award alimony to her in the future. However, the decree also awarded custody of the children to the wife, with certain conditions, and required the husband to pay certain sums for their support and for a counsel fee, and the costs, and the husband did not appeal from these provisions. Hence the decree will be reversed in part and affirmed in part.

The appellee filed a motion *ne recipiatur* in which she contends that this Court should not receive the appellant's brief and record extract because it does not comply with the Maryland Rules. The complaint is that the brief and record extract are slightly undersized, that the extract fails to contain a table of contents and the brief a table of citations alphabetically arranged, and that "in many instances" authorities and testimony are inaccurately quoted. Although there seems to be a technical failure to comply with some of the rules we shall deny the motion since there appears to have been no real prejudice to the appellee. *Burrell v. Frisby,* 212 Md. 181, 129 A. 2d 75 (1957). See also *Irvine v. Montgomery County,* 239 Md. 113, 210 A. 2d 359 (1965). In so holding, we do not mean to imply that we intend to relax the Rules, the requirements of which are necessary for the proper and expeditious handling of appeals. However, in this case we were informed that the impecunious appellant had the briefs reproduced by a friend to save costs, and our review of the case was not unduly impeded.

> *Motion ne recipiatur denied; that part of the decree granting the wife a divorce, and reserving the right to grant her alimony in the future, is reversed. The remainder of the decree is affirmed. Appellant to pay the costs.*