# COOVER *v.* COOVER

[No. 417, September Term, 1969.]

*Decided July 9, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*John L. Moring, Jr.,* with whom were *Robert J. Callanan* and *Callanan, Goff, Moring & Callanan* on the brief, for appellant.

*Richard C. Murray,* with whom were *Cook, Mudd, Murray & Howard* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court. SMITH, J., dissents. Dissenting opinion at page 655 *infra.*

The trial judge (MacDaniel, J.) signed a decree on October 29, 1969, in the Circuit Court for Baltimore County divorcing *a mensa et thoro* the appellee, Mae Elizabeth Coover, the plaintiff below (Mae), from Fred L. Coover, Jr., the appellant and defendant below (Fred), on the ground of Fred's constructive desertion of Mae. The principal challenge to that decree is Fred's contention that there was not sufficient evidence presented in the lower court to show that he was guilty of constructive desertion. Fred also contends that the trial court erred in admitting into evidence certain correspondence between the parties written after their separation. For the purposes of this opinion we shall assume, without deciding, that there was no error in admitting the correspondence into evidence, inasmuch as we are of the opinion that, including the correspondence as properly part of the record, there was not sufficient evidence under our prior decisions to justify a finding of constructive desertion on the part of Fred.

In stating and evaluating the facts, we shall bear in mind the provisions of Maryland Rule 886 a which provides that the "judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." *Garner v. Garner,* 257 Md. 723, 264 A. 2d 858 (1970).

The parties were married in Baltimore City on November 19, 1949. Two children were born of this marriage, *i.e.,* Carol McNeal Coover, born May 27, 1955, and Fred L. Coover, Jr. (Chip), born January 19, 1958. Both parties had resided in Baltimore County since 1949 and had lived at their home, 1224 St. Andrews Way, until March 23, 1969, when Mae left the home.

Mae testified that she and her husband, Fred had been "getting along very poorly" several weeks prior to March

22 and 23, 1969. In the middle of the night Fred awakened her and attempted to force his attentions upon her, tearing off and ripping her pajamas. She screamed and her daughter came into the bedroom of the parents. Mae then went to her daughter's bedroom and spent the rest of the night there. She did not call the police. She attended Church and performed her normal duties in the home on Sunday, March 23, including cooking Sunday dinner for the family. Fred left the home for several hours to get some firewood, but returned for dinner. At dinner he lectured the children for "about two hours." Fred told his daughter that she was never again to enter his bedroom and "that if she had any fear for her mother she should call the police."

Around 7:00 to 9:00 P.M. on the Sunday evening of March 23, Mae took some mending and went down to the basement clubroom with a glass of Pepsi-Cola. She had consumed part of the glass of Pepsi-Cola and went to the powder room. While there, she saw Fred come down the stairs to the club basement in a "very sneaky way." She assumed he was looking to see where she was. After she returned to her mending, she did not see Fred. She then picked up her glass with the unfinished Pepsi-Cola, took one sip and "nearly gagged." She testified that she was terror stricken because the drink was bitter and burned. Mae then went upstairs where Fred was sitting in the kitchen and called for her eleven year old son, who, at that time, did not respond. She then went to her son's "bedroom area" and requested her son to taste the Pepsi-Cola, stating "Chip, mother's Pepsi tastes very peculiar, I am not sure what is wrong. I want you, for me, to taste this and then I am going to put my finger in your throat and make you regurgitate." The son tasted the Pepsi-Cola and cried out "it is horrible, it is bitter." It was not necessary to make him regurgitate. The son then checked the medicine cabinet in the bathroom and saw, as did Mae, "empty medicine vials, tranquilizers, sleeping pills, a series of doctor's prescriptions that had been piling up over a period of years." Mae testified that she then went

to the kitchen with Chip and accused her husband "of putting something in my drink. I didn't know what it was." Fred denied it. Mae then "panicked and I washed it [the Pepsi drink] down the drain and there is no evidence."

Near 9:00 P.M. Mae started to go get her daughter Carol from her Church meeting, but Fred insisted that he go and bring her home. He did this. Around this time Mae called her brother-in-law, Robert Grund, to come and get her and the children. He arrived some 20 minutes later with a policeman. In the meantime, Mae had packed some of her belongings and those of the children; and upon Fred's return home with Carol, she took both children, left the home immediately and went to the residence of her brother-in-law.

On cross-examination, Mae testified that she had both a bachelor's and master's degree from Towson State College, has taught school for a number of years and was earning, at the time of the hearing, approximately $13,-000 for ten months of teaching. She further testified that in December 1968 she had told Fred that she had been seeing Edwin Logan, a professor at Towson State Teacher's College since August 1968. She stated that she had known Mr. Logan since she was 17 years of age and had seen him as a friend. She had met Mr. Logan for lunch in her home with her children present and had seen him in the library on Tuesday evenings between August and December of 1968. She knew that Mr. Logan and his wife separated the last part of March 1969.

On March 16, 1969, Fred accused his wife of having received a marriage proposal from Mr. Logan, but this was denied by Mae. Mae told Fred, however, that she was considering leaving him at that time. She consulted Mr. Thomson, an attorney, on March 18.

Mae also, on cross-examination, amplified the circumstances surrounding the activities on March 22-23. She stated that she and Fred had been to a dinner party on Saturday evening. She denied that Fred upon arriving home had requested to have relations with her, but said

that she had taken a sleeping pill as she had been doing since approximately 1964.

She then stated that while she was asleep, Fred awakened her by attempting to pull her pajamas off; but he did not strike her and he was not intoxicated. She testified that Fred did not ask her to have relations but the conversation was in the nature of an order to do so. She then called to her daughter, Carol, who came into the bedroom and was ordered by her father to leave. Carol refused to do this and Mae then went to Carol's room for the rest of the night. Fred remained in the house during the night. Mae did not seek outside help or leave the home to go to a motel. She testified on re-cross-examination that she did not like her husband.

The son and daughter substantially corroborated their mother's testimony in regard to the episode in which each participated.

The brother-in-law, Mr. Grund, testified that after Mae had telephoned him on March 23, he had gone to her home with a policeman and moved Mae and the children to his home. He stated that Mae was "very disturbed" but was not "rattled." She was "as calm as she could be" because she had the children's things packed up. He also stated that during a subsequent conversation, Fred had told him that he had thrown his wife's medicines down the drain.

Mrs. Margaret Seitz, mother of Mae, testified for Mae in regard to two photographs that Fred had sent her in April 1969. The photographs were of her deceased husband's grave and had listed the names of Fred, his son, his daughter and the words "Dishonored daughter." There was objection to the admission of these photographs into evidence on the ground that they were sent *after* the separation of the parties; but the trial court overruled the objection and admitted them into evidence. On cross-examination, Mrs. Seitz testified that she and Fred "have always been good friends" and that she had never "had any argument with him."

Mrs. Evelyn B. Roberts, a friend of the Coover family,

testified that on one occasion *subsequent* to the separation, Fred had related to her the factors involved in the separation of Mae and himself. He stated to Mrs. Roberts that he would destroy Mae "one way or the other, break her down mentally, physically, or financially, and he had many plans in mind, if one didn't work he would pursue one and another and another one."

The trial court, at the conclusion of the testimony offered on behalf of the plaintiff Mae, refused to grant Fred's motion to dismiss the bill of complaint.

Thereafter, Fred called Mrs. Catherine C. Logan as a witness for him. Mrs. Logan testified that at least on one occasion—March 16, 1969—she came upon her husband and Mae in Mae's automobile at a shopping center parking lot. Mae ducked down so as not to be seen, but Mrs. Logan backed her car into the bumper of Mae's automobile and then backed up and rammed Mae's car again. At that time the Logans had been separated for some period of time.

Fred, testifying on his own behalf, stated he has an A.B. degree, with a major in economics, from Washington and Lee University. He is an accountant. He further testified that Mae had admitted to him in December 1968 that she had met Mr. Logan on a parking lot and stated that she had "misbehaved." She had been with Mr. Logan "and it was with him she had misbehaved." When she told him this, she had been in bed for most of four days and "broke down in abject tears." Mae further admitted to him that she had been seeing Mr. Logan since August 1968. She was seeing him on Tuesday nights in the library. Mae also stated that she was making plans to leave him and on March 19, became upset with him because he would not agree with her on a general pattern for a proposed distribution of their real and personal property. Fred testified that Mae had told him that she had received an offer of marriage from Mr. Logan which she had neither accepted nor rejected.

Fred's account of the evening of March 22 was that he and his wife had attended a dinner party at the home

of a mutual friend. Upon his return home, he invited Mae to share his bed but she declined even though it was Fred's 43rd birthday. Fred heard the medicine cabinet slide and water being drawn, indicating that Mae had taken a sleeping pill. She had been taking sleeping pills since early 1964. He then sat down to read a magazine and upon entering Mae's bedroom at approximately 4:00 A.M., Sunday morning, March 23, he undressed and again asked Mae to have relations with him which were refused. Mae stated that she would call Carol and did this. Carol then appeared; Fred ordered her to leave and she refused. Fred denied that he tore Mae's pajamas. He admitted that at the family Sunday dinner at about 1:30 P.M. he pinned a red ribbon on Mae's left shoulder and told the children that in perhaps 10 years Mae would answer why he had done this.

In regard to the Pepsi-Cola incident, Fred testified that he saw Mae fill the Pepsi glass and go to the basement. Thirty or forty minutes later he went down the steps to the basement because there had been no activity there even though his son had been down to the basement twice when Fred had been seated in the kitchen. He saw that Mae was in the powder room and returned upstairs to the kitchen to read the paper. In a few minutes Mae came up the stairs holding a glass and accusing him of having poisoned her Pepsi-Cola. He denied this and she then said she would have her son taste it. She then returned to the kitchen, emptied the glass, rinsed it, and set it on the drain, again accusing Fred of trying to poison her. Fred then filled the same glass with Pepsi-Cola, tasted it, said it tasted all right to him and thereafter left to pick up Carol at the church meeting. On the way home, he told Carol what Mae had accused him of and indicated that he thought Mae needed psychiatric care.

The trial court admitted into evidence, over objection, certain correspondence written by Fred to Mae after March 23, 1969. The trial court was of the opinion that it was relevant to indicate the general character of the defendant, Fred. As we have indicated we shall assume,

without deciding, that this correspondence was admissible.

Mae, recalled as a rebuttal witness, denied that she had told Fred that she had "misbehaved" with Dr. Logan. She testified that "He was a very unhappy man, I was an extremely unhappy woman, and we found solace in conversation. That was it. Because I am a very moral person, I felt guilty that. . .I had even allowed myself to take solace in conversation with another man. That is my guilt to which I referred, only that." She denied that she had ever committed adultery. She further testified: "I had already told Mr. Coover in December that I felt guilty having conferred with Mr. Logan, so that there was no possibility of his coming to my home to discuss it and he and his wife were having serious problems and there was no possibility of my going to his home. We agreed to meet in a public place at the Seminary Ridge development where we would be in front of everybody, hundreds of people passing by. There could be no question about behavior. After his wife rammed my car he did come and sit in the car for 10, 15 or 20 minutes to give me the particulars of my brother's death." Mae had testified earlier that she was seeking information from Dr. Logan who was in the Navy in regard to the details of her brother's death while also serving in the Navy.

On cross-examination Mae reiterated that in talking to Dr. Logan she "found solace, but no impropriety." She admitted that she told Fred she "felt guilty." In regard to why she ducked down on the seat when Mrs. Logan appeared at the parking lot, Mae stated "I don't know."

The trial court denied Fred's motion to dismiss the bill of complaint at the conclusion of the testimony. After argument, the lower court rendered an oral opinion in which he found, *inter alia*, that although Mae's conduct with Dr. Logan had been "very indiscreet," there was no proof of adultery on Mae's part and the trial court was convinced that she had not committed adultery. The trial court found that the marriage had been a relatively good marriage up to 1964 and that up to March 22, 1969, the

most the wife had shown was that her husband Fred was "very argumentative, peculiar, that it presented many problems to her." The trial court correctly observed that under the decisions of this Court, this would not have amounted to grounds for a divorce.

In regard to the episodes of March 22 and 23, the trial court found that Fred did rip Mae's pajamas and acted in a belligerent and aggressive manner on that occasion. Here, again, the lower court properly concluded that this conduct was insufficient to justify a divorce *a mensa et thoro* on the ground of constructive desertion.

In regard to the Pepsi-Cola incident, the lower court concluded that Fred "did in fact put something in this drink and that Mae was put in fear and had a right to leave him at that time." The trial court stated the fact, that there might not be poison in the drink, was not the important fact, but that having put a foreign substance in the drink, with all of the other evidence in regard to Fred's peculiar disposition, was sufficient to make this act one which would put Mae in fear of her life and which justified her leaving the marital abode. The lower court was also of the opinion that Fred's "baseless" accusations of adultery were sufficient to justify Mae's leaving the marital home.

The lower court, on October 29, 1969, passed a decree with the following provisions:

1. Mae be divorced *a mensa et thoro* from Fred.

2. Permanent care and custody of the son and daughter of the parties be given to Mae.

3. Fred should pay $10.00 a week for the support of each minor child (a total of $20.00 a week), payable through the Baltimore County Probation Department.

4. Rights of visitation of the minor children be given to Fred as set forth in Paragraph 4.

5. Mae is not entitled to receive alimony based on the respective circumstances of the parties at the present time, and the issue of alimony is reserved for future consideration by the court.

6. Fred be permanently enjoined from harassing Mae and the members of her immediate family.

7. The costs be paid by Fred.

We have concluded that, under the decisions of this Court, the lower court erred in holding that Mae had established a case of constructive desertion. We shall, therefore, reverse the decree of October 29, 1969, in so far as it granted Mae a divorce *a mensa et thoro* from Fred in Paragraph 1 and reserved the question of alimony in Paragraph 5.

As we have indicated, we accept as an established fact that Fred placed a foreign substance in the Pepsi-Cola (although he denies this) ; but, in our opinion, this single act is not sufficient to indicate an intention to do serious bodily harm or to threaten serious danger in the future. Judge Sybert, for the Court, stated the Maryland law in this regard in *Applegarth v. Applegarth*, 239 Md. 92, 98, 210 A. 2d 362, 366 (1956) as follows:

> "If the wife's version of what occurred during the altercation between the parties around Christmas, 1961, be accepted, the single act of violence complained of by her does not measure up to what the law of this State requires as constituting a justification for the wife's living apart from her husband. As was pointed out in *Harrison v. Harrison*, 223 Md. 422, 164 A. 2d 901 (1960), a constructive desertion case, a single act of violence, in order to constitute cruelty of treatment, 'must indicate an intention to do serious bodily harm, or be of such a nature as to threaten serious danger in the future.' (p. 426 of 223 Md.) Neither of those elements was present here."

In *Applegarth,* the wife had testified that her husband had thrown her to the floor and kicked her. In trying to escape, she broke through a glass door with her hands, cutting them. In *Harrison v. Harrison*, 223 Md. 422, 164 A. 2d 901 (1960), cited in *Applegarth* with approval and

followed in that case, the husband had struck his wife, pushed her out of bed to the floor, beat her about the face, neck and upper part of her body. Her eyes were quite swollen, her nose bleeding and her lips were cut. She had a bump on the back of her head. Shortly after the attack, the wife left the home and spent the night with neighbors.

In neither *Applegarth* nor *Harrison* did we find the single act of violence sufficient to establish constructive desertion on the part of the husband or such cruelty of treatment as to justify a divorce *a mensa et thoro*.

In the present case, assuming as we do that Fred did place "a foreign substance" in Mae's Pepsi-Cola, it is clear to us that the substance placed in the glass was not poison and that Mae knew, or should have known, that it was not poison. Although she stated that she was in great fear, her actions are clearly contrary to her statements.

In the first place, there was no evidence offered that there was any poisonous substance in the medicine cabinet or that Fred had purchased or otherwise acquired any poison. The bottles in the medicine cabinet were of old prescriptions, sleeping pills and the like. Secondly, the noxious substance was so obviously present in the drink that neither Mae nor her son swallowed—or were likely to swallow it. Thirdly, it is almost incredible that if Mae had really believed that the substance in the Pepsi-Cola was a lethal poison, she would have invited her son to taste it. Fourthly, if Mae had really believed the substance to be poison, the last thing she would have done would have been to put it down the kitchen drain and see to it, as she put it, that "there is no evidence." Finally, even after this episode, she permitted her husband —the supposed poisoner—to go for her daughter at the church meeting even though she knew that Fred was highly displeased with his daughter and had lectured her for some two hours at the Sunday dinner. Then, too, these parties had been married some 19 years prior to the March 23 episode. Mae concedes that during the marriage, Fred had never struck or physically assaulted her.

He did not drink. We conclude that the lower court was clearly in error in concluding that Mae thought that Fred had sought to do her serious bodily harm or intended to do her serious bodily harm in the future.

Nor do the accusations by Fred of his wife's alleged adultery, under the circumstances of this case, amount to conduct which would indicate a "pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable." *Beavers v. Beavers,* 255 Md. 450, 258 A. 2d 203 (1969). Here again, we accept the lower court's finding that there was no proof of adultery. However, it cannot be said that Mae's admitted statements to Fred in regard to seeing Dr. Logan, the "guilt" which she felt, her "abject tears" and staying in bed for the best part of four days, together with Mrs. Logan's actions when Mae sought to conceal herself on the parking lot, could not lead Fred reasonably to assume that Mae's interest in Dr. Logan was not platonic. His "charges" against Mae were not made publicly, but within the confines of the family. See *Li v. Li,* 249 Md. 593, 241 A. 2d 389 (1968). Cf. *Liccini v. Liccini,* 255 Md. 462, 258 A. 2d 198 (1969). In any event, the parties continued to live together after the Logan episode, Mae testifying that she had never refused marital relations with Fred prior to the refusal on March 22, 1969. We are of the opinion that the lower court was clearly in error in concluding that the accusations of adultery in the present case would justify the wife in leaving the marital abode.

In our opinion, under the circumstances of this case, it was not proper to grant the injunction against harassment in Paragraph 6 of the decree of October 29, 1969.

> *Decree of October 29, 1969 modified by deleting paragraphs 1, 5 and 6 of the decree and as modified, affirmed; the costs to be paid by the appellant.*

SMITH, J., dissenting:

I think the decree should be affirmed.

Maryland has long been recognized as one of the more strict, if not one of the most strict, of the states relative to divorce. In fact, back in 1937-38 Professor John S. Strahorn, Jr., of the School of Law of the University of Maryland, was fond of making the point to his classes in domestic relations that there were only two states in the United States as of that time with divorce laws more strict than Maryland—New York, where the only ground was adultery, and South Carolina, which at that time did not permit divorce.

With that background it becomes interesting and significant to note that our predecessors in *Harding v. Harding*, 22 Md. 337 (1864), having its origin in 1857, reversed the chancellor who had denied relief to the wife. There a woman left her husband after his "allegations of the gravest and most serious character, impeaching the virtue and chastity of the appellant, and charging that her child was not his, but the offspring of another man." The Court said:

> "Under these circumstances, he told her to leave his house; her expulsion was as much compulsory as if he had employed force to eject her. And being, according to the proof in the record, without sufficient cause, we must consider it as an unjustifiable abandonment and desertion on his part. So it was decided in *Levering v. Levering*, 16 Md. 213." *Id.* at 345.

Moreover, although there have been many statements by this Court to the effect that generally speaking a single act of violence will not be sufficient to justify a wife in leaving her husband, in the day when divorce was much less prevalent than it is today and our divorce laws much more strict than they are today, our predecessors in the case of *Levering v. Levering*, 16 Md. 213 (1860), said:

> "There is evidence to prove that, on one occa-

sion, forgetful of his duty and obligation to cherish and protect her, or, what is more probable, impelled by the madness of intoxication, he inflicted violence upon her person. Such conduct, when taken in connection with other facts and circumstances of the case, showing his ill-treatment of his wife, in the eye both of humanity and the law, would justify her in leaving his society * * *.

"By the Act of 1841, the court is authorized to decree a divorce *a mensa et thoro* for cruelty of treatment. We have said that in this case there is evidence of such cruelty as justified the complainant in leaving the society of her husband. Such evidence, under the law, authorizes us to sanction that separation by pronouncing a decree of divorce *a mensa et thoro*, and this relief we are warranted in granting by the evidence in this cause, under the 3rd section of the Act of 1841." *Id.* at 219.

This holding of *Levering* has been cited as recently as *Stirn v. Stirn*, 183 Md. 59, 65, 36 A. 2d 695 (1944). More recently, a similar statement relative to one act was made in *Scheinin v. Scheinin*, 200 Md. 282, 289, 89 A. 2d 609 (1952). See also Annot., 7 A.L.R.3d 761 (1966).

In *Scheinin* Judge Delaplaine said for the Court:

"So in Maryland physical violence is no longer essential to constitute cruelty of treatment. It is now accepted that cruelty as a cause for divorce includes any conduct on the part of the husband or wife which is calculated to seriously impair the health or permanently destroy the happiness of the other. Thus any misconduct of a husband that endangers, or creates a reasonable apprehension that it will endanger, the wife's safety or health to a degree rendering it physically or mentally impracticable for her to properly discharge the marital duties constitutes

cruelty within the meaning of the divorce statute. *Wendel v. Wendel,* 154 Md. 11, 139 A. 573. For instance, in *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325, this Court held that evidence that the husband had made false and malicious accusations of unchastity against his wife in the presence of others and had committed other acts designed to humiliate her justified a divorce *a mensa et thoro." Id.* at 289-90.

In that case there was no showing of wrong-doing between the husband and his secretary, but they did move into a new home of the parties before the wife did. The wife later objected to the secretary's presence in the home and there were disagreements between them. She asked the secretary to leave, to which the husband objected. The husband "talked to her in abusive language and ridiculed her before the children." The wife claimed, and the husband denied, that he ordered her out of the bedroom. The husband and the secretary took nightly trips together and after the cessation of cohabitation between the husband and wife, traveled together to the seashore. The wife did not move out of the home because she had nowhere else to go. The Court said:

> "The chancellor, who had the advantage of seeing and hearing the witnesses, believed complainant rather than defendant, and we are unwilling to say that he was clearly wrong in his decision. Defendant's continued misconduct naturally would have the effect of making the matrimonial relation intolerable. * * *
>
> * * *
>
> "It is not important that defendant did not drive his wife from home by force. If ill temper, vile language and artifice succeed, they are as reprehensible as forcible compulsion. In either case the offending party is responsible for the separation. We are satisfied that defendant either contrived or wilfully permitted the

cessation of cohabitation, and accepted it with complacency. It is not necessary for a wife to prove that her husband, in committing wrongful acts, entertained a settled purpose to drive her away; it is sufficient if the separation was the natural consequences of his acts." *Id.* at 291-93.

Instances in which constructive desertion has been found have included: *Liccini v. Liccini,* 255 Md. 462, 258 A. 2d 198 (1969), accusation of homosexuality; *Soles v. Soles,* 248 Md. 723, 238 A. 2d 235 (1968), where the husband insisted upon abnormal sexual relations, the wife stating that the husband received " 'more satisfaction from oral sex relations' than she considered normal"; *Hamilton v. Hamilton,* 242 Md. 240, 218 A. 2d 684 (1966), where the wife forced the husband to live apart from the family in the attic and, although he was permitted to eat dinner with the wife and children, the children were not allowed to speak to him nor permitted to pass food to him at the table; *Bryce v. Bryce,* 229 Md. 16, 181 A. 2d 455 (1962), where the wife pushed the husband down cellar steps, attacked him physically on different occasions, ripping his clothes and throwing objects at him and publicly ridiculed and embarrassed him; *Pohzehl v. Pohzehl,* 205 Md. 395, 109 A. 2d 58 (1954), where the husband falsely accused the wife of adultery, ordered her from the home, and would permit her to return only if she agreed to enter into a blackmail scheme against the person with whom the husband had accused her of having committed adultery; *Zimmerman v. Zimmerman,* 199 Md. 176, 85 A. 2d 802 (1952), where the husband insisted that a cousin, who had an open wound which emitted a sickening odor, live in the home; *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792 (1949), where the wife falsely accused husband and his family of thievery, claiming that her mother-in-law taught her own children to steal, that the husband and his mother had stolen various items from stores, post offices, etc.; *Geisey v. Geisey,* 190 Md. 618, 59 A. 2d 319 (1948), where the husband re-

stricted the wife so that she was not allowed to go shopping, to the cinema, to visit her family or to have friends, and when visiting a restaurant she was obliged to face the wall or the kitchen for fear she would be attracted to another man; and *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475 (1941), where the wife, who apparently was mentally ill, made a severe attack on the husband, complained to his employer of his immoral conduct with women at work, accused him of infidelity in the presence of their child, struck the husband and locked herself in the bedroom. In *Kruse,* Chief Judge Bond said for the Court:

> "It is settled that conduct of one spouse which compels the other to leave may justify a divorce to that other on the ground of desertion, even though the conduct may not justify a divorce on the ground of cruelty. *Harding v. Harding, supra; Singewald v. Singewald,* 165 Md. 136, 137, 166 A. 441. It must, however, render impossible the continuation of matrimonial cohabitation with safety, health, and self-respect. *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259. And putting aside for the moment the question of this wife's responsibility, this Court, concurring with the chancellor, concludes that her actions did render it practically impossible for the husband to continue living with her longer than he did. As described in the record it was such as would break the patience of any husband. His work and livelihood would have been jeopardized if he had continued, and peaceful living seems to have been impossible." *Id.* at 663.

See also *Rosenthal v. Rosenthal,* 202 Md. 375, 96 A. 2d 500 (1953), where there was evidence of excessive sexual demands; after the husband quarreled with the wife he demanded sexual intercourse; and on one occasion "[a]fter she took refuge [in the home of a sister], her husband banged on the front door and shouted: 'If you don't let me in, I will kill everybody in there!' " The hus-

band then entered and struck the wife. There *Judge* Dela-plaine said for this Court in reversing the chancellor:

"The chancellor stated that both were tempera-mental and highstrung and neither was willing to afford to the other that degree of compatibil-ity which each had the right to expect. The chancellor also stated that the scuffles were not acts of cruelty, but were merely episodes in which both parties were engaged.

"We are convinced that the evidence is suffi-cient to warrant a divorce either on the ground of cruelty or on the ground of constructive de-sertion. In the first place, the record is replete with proof that appellant was striving to be a faithful wife and mother. Her earnest desire was to have a home in which she could rear her young son. She declared on the stand: 'I tried to be a good wife and mother. I did everything I knew possible. Anything that was in my power I would do. * * * I was always home. I always had my meals prepared, and I always tried to keep my home to the best of my ability.'

"The difficulty was that her husband had no regard for her feelings or her health. She told the Court: 'I have met all kinds of people but I never in my life heard the language that could come out of one man's mouth. When I was eat-ing I would have to go in the bathroom and throw up, and in the presence of my child, and the child was repeating the same thing as my husband. That really made me sick also. I have never heard the language in my life to come out of any one's mouth that came out of his mouth.'

"The law is now established in this State that physical violence is not essential to constitute cruelty of treatment. As stated in *Scheinin v. Scheinin*, 200 Md. 282, 289, 89 A. 2d 609, 612: ' "It would be a reproach to the law to permit

a husband to ruin the health of his wife or kill her in one way, but not in any other." ' We adhere to the rule that mere rudeness, the use of profane and abusive language, and even sallies of passion do not constitute cruelty as a ground for divorce. *Sullivan v. Sullivan,* 199 Md. 594, 87 A. 2d 604. On the other hand, any misconduct of a husband that endangers his wife's health to a degree rendering it physically or mentally impossible for her to properly discharge the marital duties constitutes cruelty within the meaning of the divorce statute. Moreover, any misconduct of a husband that renders the marital relation intolerable and compels the wife to leave him may justify a divorce on the ground of constructive desertion, even though the conduct may not justify a divorce on the ground of cruelty. Any misconduct of a husband that makes it impossible for his wife to live with him without loss of her health and self-respect, or gives her reasonable apprehension of bodily injury, will justify her in leaving him. *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792." *Id.* at 380-81.

The rule is well-established in Maryland that in divorce actions evidence of occurrences subsequent to the filing of a bill of complaint or a cross-bill is admissible in evidence, although only, as Chief Judge Brune said in *Besche v. Besche,* 209 Md. 442, 452, 121 A. 2d 708 (1956), "as reflecting upon intent or probabilities or revival of condoned offenses (as in *Schwab v. Schwab,* 96 Md. 592, 54 A. 653 [(1903)])." See also *Dearholt v. Dearholt,* 178 Md. 405, 13 A. 2d 538 (1940) ; *Williams v. Williams,* 156 Md. 10, 15-16, 142 A. 510 (1928) ; and *Carter v. Carter,* 139 Md. 265, 271, 114 A. 902 (1921). Also see 24 Am.Jur.2d *Divorce and Separation* §§ 366, 372 (1966). I would regard the husband's conduct here subsequent to the separation as having no less bearing in reflecting upon "intent or probabilities".

Here the chancellor quite obviously believed the wife and her witnesses. The bedroom incident the night before the separation was corroborated by the daughter. We have said that in a contested case only slight corroboration is necessary.

If Mrs. Coover had not poured out the drink, then she might definitely have established that her husband put poison in it. On the other hand, the chancellor concluded that the husband did put some foreign substance in it. I find most persuasive the chancellor's comment:

> "This is an act of a foreign substance being put in a drink. It is readily admitted by this Court that no one knows what that foreign substance was. By the same token, if Mr. Coover would have shot a gun at his wife and missed her five or six different times would the fact that he missed her and didn't hurt her mean that one act was not sufficient for her to be put in fear and to leave? This Court feels this type of action fits more that type of a pattern than the type of pattern in the cases which have been stated wherein it takes more than one act. In those cases it didn't state it always is more than one act, it just stated under the circumstances of these cases, and this Court distinguishes this case from those cases."

In my mind it is not necessary to establish that it was in fact poison that the husband put in the drink. It is, obvious that he desired the wife to believe that the drink had been harmfully adulterated. Such conduct on the part of the husband would be calculated to place terror in the heart of any woman. It comes entirely within the prior cases in this Court which have justified "the wife in leaving [the husband] when it makes it impossible for her to live with him without loss of her health or self-respect, or gives her reasonable apprehension of bodily injury." *Scheinin v. Scheinin, supra,* at p. 290.

The most peculiar conduct of the husband subsequent

to the separation, including his apparently unfounded allegations and complaints to public authorities relative to alleged misuse by the wife of funds of the children, serves to emphasize his state of mind and make abundantly clear his hostility toward his wife.

The changing mores of our society are well-demonstrated when one notes that the report of the Administrative Office of the Courts for the period between September 1, 1968, and August 31, 1969, states that 50.7 per cent of the 25,149 equity cases filed in Maryland were divorce proceedings. If our predecessors of more than 100 years ago were content to find cruelty in *Levering, supra,* and constructive desertion in *Harding, supra,* justifying the wife in both instances in leaving the husband, then I certainly believe that the husband's conduct here, believed by the chancellor who had the opportunity to hear and observe the demeanor of the witnesses, should be interpreted as justifying the wife's absenting herself from the home.