## MARY A. KRUSE *v.* HARRY D. KRUSE

## HARRY D. KRUSE *v.* MARY A. KRUSE

[Nos. 10 and 11, October Term, 1941.]

*Decided November 6th, 1941.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*George Ross Veazey* for Mary A. Kruse.

*C. Marshall Barton,* with whom was *Randolph Barton, Jr.,* on the brief, for Harry D. Kruse.

BOND, C. J., delivered the opinion of the Court.

On a bill and a cross-bill filed by a married pair, a divorce *a mensa et thoro* has been granted to the husband on the ground of constructive desertion by the wife, custody of an infant son of the pair has been awarded to the mother, with privileges of association with him granted to the father, and the father has been required to pay the wife alimony while the appeal is pending, to pay an increased sum of money for support of the son, and to pay the wife an amount for a fee to her counsel on appeal. The parties respectively appeal from portions of the decree unfavorable to them. On the cross-bill for a divorce, and the prayer of the wife for an allowance of permanent alimony, a main question is one of the wife's mental responsibility for acts which forced the husband to leave her. Her case on appeal is rested largely on irresponsibility at the time.

The testimony is voluminous, and the chancellor, during the taking of it, found it necessary to remind the

wife's former counsel of the volume and cost of a transcript in case of an appeal. The facts cannot all be recited, in an opinion, but illustrative instances may be given.

The couple were married in 1925. The husband was then a graduate student at the Johns Hopkins University. Later he became a research worker in bio-chemistry at the School of Hygiene, and later still, in the Fall of 1937, a research worker of the Milbank Memorial Fund in New York, where he was employed at the time of the hearing below. At the outset of married life the wife worked at teaching and otherwise to aid in the family income. In the first year there was no great contention, but the husband testifies to irritability expressed in the wife's complaints about his income and other subjects, and disturbances of a minor nature because of these things. The son was born on February 13th, 1931.

In November of 1932 the wife had what is described as a nervous breakdown and submitted to treatment at the Phipps Psychiatric Clinic of Johns Hopkins Hospital, remaining there until after the following Christmas. She appears to have been nervously ill, if not insane, at that time, her condition having been diagnosed as a paranoid development with depressive features. Dr. Esther L. Richards, of the Phipps Clinic, testifies to delusions of persecution, growing suspicion of her physician, Dr. Conn, until his usefulness ceased, and suspicions of the nurses. It was then expected that the condition would progress, and Dr. Kruse was told that it was only a matter of a year or two when the wife would have to be confined more or less permanently.

During these years, and up to 1935, there was difficulty most of it, according to the testimony of the wife herself, due to her own fault. She interfered to a great extent with the husband's work, frequently calling him away to stay at the home with the child, or for other reasons. The son was at times put away from her to give her quiet; she rested much, and was ineffective at housework. She testifies that from 1931 to 1936 she was ill and unable

to work. And she would sometimes leave the home without notice and stay at the Young Women's Christian Association in Baltimore. She had so much difficulty with housemaids that employment of them was given up. She complains that the husband was harsh with her, reproving her for selfindulgence and inactivity, and charging her with insanity, but the court does not find his conduct other than that which might be expected from a man whose patience was pushed to extremity. Dr. Conn saw the wife at intervals before and after she left the Phipps Clinic.

On New Year' Eve, December 31st, 1934, when returning in their automobile from a moving picture theatre, she made an attack upon the husband of such severity as to suggest lack of mental balance. She explains that she playfully flicked her finger under his nose, and merely out of anger attacked him when he pushed her away. He testifies, that he pushed her away because he was driving over a sleety street bed, and could not be interfered with. He then presented the situation to Dr. Richards, and she, summoning the wife's relatives, advised that on the report she had it appeared that the time for confinement had come. The relatives did not concur, however, and a few months later the husband and wife separated by agreement.

In 1935, assuming that her husband must be having immoral relations with other women, she picked out the other women somewhat at random, invaded the School of Hygiene where he was employed with complaints to his superior of women at work there, and complained of particular women elsewhere. As late as 1937, after the final separation, when he called to see his son, she came in and in the presence of the son accused him of immorality. All these suspicions on her part are proved to have been unfounded in fact.

On September 1st, 1935, there was a reconciliation, but one which lasted only until February 29th, 1936. On the night before this latter date, there was a quarrel over a charge of improper relations of the husband with a

woman at Gibson Island, where he had attended a medical conference. And on the next day the wife struck her husband, and locked herself in her bed room; and he then left finally. The testimony of the two in explanation of that incident differs; she justifying it as in the nature of self-defense, he finding it unprovoked and the effect on his son intolerable. The parties have been separated since that time, and the husband contends that he was forced to leave by her treatment.

This conduct of the wife, recited in brief as it must be, tends to indicate that her actions were beyond her control, that she was irresponsible. And it should be mentioned that during the course of the litigation she has employed eight, possibly as many as twelve, attorneys in succession, caused the litigation to be prolonged by her vacillation, and twice disappeared from the court room when her case was about to be heard, and could not be found. After the last disappearance she came into court of her own initative, when testimony on the cross-bill had begun. Yet, on the other hand, there is credible testimony that in the sight of other people she ordinarily behaved in the manner of a lucid woman, and took good care of her child. And her testimony in the record, in respect to intelligence and clearness, could hardly be excelled. The fears for her sanity in 1935 seem not to have been realized. Dr. Guttmacher, of Baltimore, from an examination made in June of 1940, reported that she could not be considered a seriously sick person from the psychiatric point of view. And in the pleadings below she protested against the imputation of insanity.

Since the final separation, and the institution of suit, she has written her husband seeking another reconciliation, and in 1940 in telegram asked the aid of his sister in effecting one. The advances were rejected by the husband, he saying he would rather be dead than live with his wife. After a long trial of it, cohabitation appears to be impracticable, because of this aversion created by the wife's actions, and there is no sufficient promise of removal of the cause. She cannot urge, as desertion of her,

the obstacle for which she is responsible. *Smith v. Smith,* 55 N. J. Eq. 222, 230 and 231, 37 A. 49.

The husband has during the entire married life continued to support the wife and child according to his ability.

Her bill of complaint, filed on February 5th, 1937 a year after the final separation, prayed a divorce *a mensa et thoro* from the husband, as well as custody of the child, alimony and support. The husband's answer to it averred that while the wife had not been found to have a definite mental disorder, the physicians had attributed to her at least such a mental condition as to make it difficult for her to live harmoniously with any one, and led the husband to believe that she was not in fact responsible for her conduct and ought to be treated as a mental invalid, and that he was advised to tolerate the condition, however unhappy and unfortunate they were, and averred that conditions made it essential that they should not live under the same roof. On February 6th, 1939, the wife amended her bill by striking out the prayer for a divorce.

During the prolongation of the litigation there were proceedings relating to increases in alimony *pendente lite,* and opportunities for the father to see the child. In a petition of his on December 18th, 1939, he stated that he had refrained from pushing the case to a hearing because of the belief that the wife's condition was to a large extent due to her mental state. And in answer the wife protested against raising an issue of her sanity, and against the husband's references to it without resorting to lunacy proceedings. Thereupon the husband, on January 12th, 1940, filed his cross-bill praying that a divorce be granted to him.

In a brief opinion the chancellor stated his conclusion upon the testimony and "upon the demeanor of the plaintiff both on the witness stand, and as observed by the chancellor while she sat at the trial table." The wife was found not insane then, and in legal contemplation never insane. The unfavorable prognosis in 1932 and 1935 appeared, happily for her, to have been erroneous. And her rights and obligations were found determinable

upon the basis of full mental responsibility. Her conduct was found to have forced the husband to leave her, and the grant of the divorce to him followed. *Harding v. Harding,* 22 Md. 337; *Lynch v. Lynch,* 33 Md. 328. As the wife was found in proper condition for it, her prayer for custody of the child was granted.

It is settled that conduct of one spouse which compels the other to leave may justify a divorce to that other on the ground of desertion, even though the conduct may not justify a divorce on the ground of cruelty. *Harding v. Harding, supra; Singewald v. Singewald,* 165 Md. 136, 137, 166 A. 441. It must, however, render impossible the continuation of matrimonial cohabitation with safety, health, and self-respect. *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259. And putting aside for the monent the question of this wife's responsibility, this Court, concurring with the chancellor, concludes that her actions did render it practically impossible for the husband to continue living with her longer than he did. As described in the record it was such as would break the patience of any husband. His work and livelihood would have been jeopardized if he had continued, and peaceful living seems to have been impossible.

But both parties agree that if the wife's actions which caused the husband to leave were beyond her own control because of mental derangement, her forcing him out did not afford ground for a divorce to him, because a competent will on the part of the wife was necessary to render her capable of desertion. Mere highstrung nerves, and unrestrained impulsiveness of a sane woman would not, on the other hand, save the actions of the wife from legal desertion. In *Lynch v. Lynch,* 33 Md. 328, 330, cited by the chancellor, this Court held that a wife's violent outrageous conduct toward the husband, rendering impossible the proper discharge of the duties of married life, furnished ground for a divorce *a mensa et thoro* to a husband who deserted the home; and that decision has been cited many times as stating the law.

Many of this wife's actions prior to the separation seem difficult to reconcile with sane control. They are, indeed, difficult to reconcile with the intelligence and clear-

ness of mind exhibited in her testimony. She was never adjudicated insane, and it is doubtful whether upon an inquisition she would at any time have been found insane. She was never confined for mental derangement, and as it turned out the case was not one for confinement. There does not seem to have been sufficient mental weakness to render her incapable of making a contract. She and her witnesses consider her always to have been in proper condition to have custody and care of her child. There was unquestionably a lack of control, but the law does not undertake to distinguish among the various degrees of lack of control of insanity, and select those which prevent a divorce and those which do not. The case here seems to the court, finally, to be a class with that of *Lynch v. Lynch, supra,* in which the reasons for the separation were the wife's "ungovernable * * * temper and * * * morbid jealousy," less than insanity. This Court therefore concurs with the chancellor that the divorce should be granted.

On the husband's appeal the continuance of payment to the wife of $100 a month as alimony during the appeal is objected to, and he has unquestionably been heavily burdened. He is earning $6000 a year, has paid alimony to the wife throughout these proceedings, prolonged through more than four years, is burdened with the costs below and on appeal, has paid $1400 for the record on appeal, and $500 for the wife's counsel. All this has been paid, however, and although the wife has some resources of her own, it seems idle to consider reversing now the order which allowed it, if found erroneous. We conclude that it was proper to award custody of so young a child to the mother, leaving it with her so long, that is, as she cooperates in affording the husband his opportunities to have it with him, as provided in the decree. An allowance of $75 a month for support of the child, being for the future, is not in itself considered excessive, and we do not understand that any objection to it is pressed in the argument.

*Decree affirmed; Harry D. Kruse to pay the costs.*