### BRYCE *v.* BRYCE

[No. 266, September Term, 1961.]

18

*Decided June 3, 1962.*

*Motion for rehearing filed July 5, 1962, denied July 6, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

The cause was reargued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*William F. Hickey,* for appellant.

*Joseph M. Mathias,* with whom were *Jones, Mathias & O'Brien* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

The wife appeals from a decree granting the husband a divorce *a mensa et thoro* and awarding him custody of the four year old daughter of the parties. The divorce was granted on the ground of constructive desertion.

Frank J. Bryce and LaRue T. Bryce were married in Baltimore, on March 31, 1943. They are the parents of three children, Frank J. Bryce, Jr., Joan E. Bryce, and Barbara Ann Bryce, born respectively, in 1944, 1946 and 1957.

Until November 15, 1960, the family lived together at 9702 Hastings Drive, Silver Spring, Maryland. On that date the appellee husband, after having previously advised his two older children of his proposed move, and after leaving a letter to his wife and a check for maintenance, moved from the marital domicile and took up residence at 9152 Piney Branch Road, in Silver Spring.

The appellee, for a number of years, has practiced dentistry, and is secretary of the State Board of Dental Examiners of Maryland, maintaining his professional office in Silver Spring, near the former residence of the parties.

On November 21, 1960, he filed a bill of complaint for a divorce *a mensa et thoro* and for custody of the three minor children. The bill alleges as the basis for the relief sought that the appellant wife, for many years, has nagged the appellee, has humiliated and embarrassed him in the presence of others, has abused him with words of contempt and scorn, has physically assaulted him, and has demanded that he leave the marital home; and that the appellant, furthermore, in fits of anger against him, has also turned upon the children of the marriage, scolding and physically abusing them without justification and purpose; so that he finally, in desperation, hoping to make life more tolerable for himself and the children, and having been constructively deserted by her, did, on November 15, 1960, leave the family home in order to preserve his own health and self-respect and in the interest and welfare of his children; that, although residing in the same house until November 15, 1960, he and his wife have not cohabited since September 1960; that there is no hope or expectation of a reconciliation of the marriage; and that he is devoted to his children, well able to take care of them and believes that their interests and welfare would best be served in his care and custody.

The appellant filed an answer denying the essential allegations of the bill. Subsequently the appellee filed a motion under Rule 420 asking the court to require a mental examination of the appellant, and following a hearing on this motion, the court ordered that the wife be examined by two psychiatrists. It was agreed between counsel that she would be ex-

amined by Dr. Peter A. Santucci and Dr. John R. Cavanagh, both psychiatrists with offices in Washington, D. C. These two psychiatrists made separate examinations, filed written reports and testified at a hearing in open court. As a result of answers to questions by the court, the court determined that she was able to attend court, consult with counsel, and defend herself in the suit.

At several hearings thereafter the court heard the testimony of the parties to the suit, their children, a Lutheran clergyman, a Catholic priest, the foster mother and father of the appellant, and others. In a memorandum opinion filed June 29, 1961, Judge Shure concluded that Dr. Bryce had been constructively deserted by his wife, and on July 14, 1961, passed a final decree granting him a divorce *a mensa et thoro;* and awarded to him the custody of the four year old child, Barbara Ann, with reasonable rights of visitation to the appellant with respect to this child. The decree awarded custody of the two older children to the appellant, with reasonable rights of visitation to the appellee with respect to them, and required the appellee to pay to the appellant for the support of the two older children $225.00 per month for each child, and to pay the appellant's counsel fee. The appellant has appealed from this decree. There was no cross appeal.

The record discloses a stormy marriage, the trouble commencing some time in 1950. The husband testified that the wife was a woman who must have her way, who has "thrown fits of temper" if she did not, and would "throw things at me" and "spit in my face." He further testified that in July 1960, in the middle of the night while he was asleep in bed, she twice threw a framed picture of her foster father at him, showering him with glass. During September and October, prior to his moving out of the house, she pushed him down the cellar steps spraining his wrist and causing it to be practically useless for two or three days; while he was on a ladder painting the house she shoved her fist through the window, showering him with broken glass, which caused him to fall from the ladder; and she physically assaulted him with a suitcase. Other incidents of physical violence toward him included throwing a baby bottle at him, striking him with a can of beer,

ripping his bathrobe to shreds, tearing up his pajamas, and tearing off his wrist watch. Approximately a week before he left the home, he testified, after his daughter Joan had gone to bed, on hearing an altercation between his wife and that child, he ran upstairs and found Mrs. Bryce had dragged Joan out of bed and the two were grappling on the floor; when he tried to calm her she turned on him and "ripped me up the back with her fingernails", and she tore his undershirt before he could quiet her. He testified that she was constantly nagging him about his duck hunting and dental meetings, and ordered him to move her bed out of his room about "half a dozen times." He related specific instances of public embarrassment, as when she criticized one of the guests at a dinner party for taking him duck hunting; and when she created a scene in Father O'Sullivan's office at Catholic University, where they had gone for marriage counseling, and afterwards stormed across the campus "screaming and yelling at me at the top of her voice." There was testimony from witnesses other than the parties to the effect that Mrs. Bryce said derogatory things to others about her husband, and testimony relating to instances and the conduct of the wife such as to embarrass him before his children.

Mrs. Bryce testified that her husband maintained an attitude of indifference, scorn, and made cutting remarks. Her explanation of the incident concerning her husband being on the ladder while painting the house was that he did not consult her on this matter, she was ill and fatigued, and "that she had no alternative but to hit with my fist, which I did." With respect to what happened on the cellar steps, she said she gave him a "slight push" down the steps, that he "did not go any further than three steps," and that he actually "sort of stumbled down three or four steps." She further explained the other incidents related by her husband as the result of her illness and fatigue; his cutting remarks, indifference and his "deliberately antagonizing" her; and that she asked him to move his bed out of their bedroom because he planned to go on a cruise which she felt they could not afford. She said that her husband on one occasion struck her (referring to the suitcase incident) with his fist and knocked her clear across the

living room floor. Dr. Bryce's version was that the blow was an "open hand shove."

The record is clear that when he left the home the husband intended to sever the marital relationship permanently. *Stecher v. Stecher,* 226 Md. 155, 172 A. 2d 515, cf. *Provenza v. Provenza,* 226 Md. 63, 172 A. 2d 503.

The principal question is whether he was legally justified in leaving, and the answer turns on "whether her conduct was such as to put him in fear of his life or to render it impossible for him to continue the marital cohabitation with health, safety, and self-respect." *Stecher v. Stecher, supra,* at page 158; *Smith v. Smith,* 225 Md. 282, 287, 170 A. 2d 195.

The appellant raises the preliminary question of whether a showing of mental disease short of actual insanity constitutes a defense in a divorce case based on constructive desertion, which mental disease rendered her incapable of forming and maintaining an intent to cause constructive desertion. The appellant's contention is that the testimony and reports of the psychiatrists support her position. Dr. Santucci reported and testified that Mrs. Bryce was suffering from an "emotional disease" classified in medical terminology as being in a "paranoid state", that she has a tendency "to show increased irritability," as well as "over-religiosity," and that she suffers from a "mental disorder" which he placed "in the psychotic group of disorders." When asked whether she has the capacity and reason to distinguish between right and wrong and to understand the nature and significance of her acts, as applied to herself, he answered: "I believe that she does have the capacity to know the difference between right and wrong." Then, as to the second part of the question he stated: "I believe the second part is in doubt; that she consistently can apply the importance or the relationship of her acts to herself. There are times when she cannot." He recommended that she be treated on an "out-patient" basis and not "institutionalized" and stated that if she were committed "the State facility would probably discharge her very shortly." Dr. Cavanagh, the other psychiatrist, who had treated Mrs. Bryce as a patient in 1956

and 1957, testified that his over-all diagnosis was that she has a "schizoaffective disorder," is "psychotic," given to "auditory hallucinations," and when asked whether she was legally insane replied: "I do not think she is committable and if committed under the Maryland Rules I think she would be discharged from the hospital, because she doesn't show on the surface these manifestations which would be disrupting in the community and which in the legal terminology make her 'insane.' "

In the lower court, as well as in this court, the appellant urged the adoption and application of the principle of law enunciated in the so-called Durham rule, applied in criminal cases in the District of Columbia and some other jurisdictions, *Durham v. United States,* 214 F. 2d 862, as applicable to the defense of this divorce case, where it is shown that the defendant was suffering from a mental disease or disorder short of actual insanity, and that her actions were the product of such mental disease or disorder.

After the original argument of this case before five members of this court we regarded this question of sufficient importance to justify consideration by all of its members, and ordered reargument before the whole court.

In criminal cases this court has never adopted the Durham rule, or any modification of it, but has reiterated its adherence to the right and wrong test relating to legal sanity, known as the McNaghten [1] or Spencer rule, *Spencer v. State,* 69 Md. 28, 13 Atl. 809, as recently as *Armstead v. State,* 227 Md. 73, 175 A. 2d 24 (1961).

We see no reason to adopt a more liberal rule in a civil case involving divorce, but are of the opinion that the law as laid down in *Kruse v. Kruse,* 179 Md. 657 (1941), 22 A. 2d 475, is sound and controls our decision here. In the *Kruse* case it was found that the wife's violent and outrageous conduct, although committed while she was suffering from a mental illness amounting to less than insanity, was sufficient to render impossible the proper discharge of married life and forced the husband to leave the home so as to justify a divorce

---

1. *Regina v. McNaghten,* 10 Cl. & Fin. 200, 8 Eng. Rep. 718.

*a mensa et thoro* to the husband on the ground of constructive desertion. There the wife admitted attacking the husband purely out of anger on a number of occasions. She invaded her husband's place of employment, where she complained to his superiors about his immoral relations with women who worked there. The court recognized the fact that the evidence showed irrational action on the part of the wife, difficult to reconcile with sane control, but Chief Judge Bond, for this court, said at page 664:

> "There was unquestionably a lack of control, but the law does not undertake to distinguish among the various degrees of lack of control [short] of insanity, and select those which prevent a divorce and those which do not."

In the present case the evidence adduced at the trial shows that the misconduct of the wife complained of was both continuous and persistent and that the "mental derangement" indicated "unquestionably a lack of control"; but here the lack of control was of a lesser degree than in *Kruse* where the record disclosed that the wife had been institutionalized, had been represented successively by some eight to twelve attorneys, and absented herself from the courtroom during the progress of the trial. Cf. *Stecher v. Stecher, supra.* Mere highstrung nerves and unrestrained impulsiveness of a sane woman will not save the actions of the wife from amounting to legal desertion. *Kruse v. Kruse, supra,* at page 663; *Ritz v. Ritz,* 188 Md. 336, 52 A. 2d 729. We may add that the "mental disorder" was not so great in its extent as to blind her to the nature and consequences of her acts. There must have been an actual subversion of the mental faculties so that the offending spouse was not able to comprehend the rightness and wrongness of her acts. The testimony of the two psychiatrists is in accord to the effect that Mrs. Bryce was not "committable" to an institution, and if she had been she would be "shortly discharged." Moreover, we assume that her ability to testify in open court was evidence of her legal responsibility for her actions. *Stecher v. Stecher, supra.*

Furthermore, the chancellor saw the witnesses, had the opportunity to judge their demeanor and credibility, and "conclusively determined that the wife was able to attend Court, consult with counsel and defend herself in this suit."

The trial judge further held that the actions and conduct of the wife were such as to compel the husband to leave the home because they rendered impossible the continuance of marital cohabitation with safety, health and self-respect. *Wood v. Wood,* 227 Md. 211, 176 A. 2d 229; *Smith v. Smith, supra; Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792; *Ritz v. Ritz, supra; Miller v. Miller,* 185 Md. 79, 42 A. 2d 915; *Kruse v. Kruse, supra.*

We concur in his conclusions that Mrs. Bryce was mentally accountable for her actions and conduct, and that these amounted to constructive desertion.

The appellant contends that the trial court erred in finding the basis for divorce as desertion, when the evidence showed mere cruelty, which was not alleged in the bill as a ground for divorce. We have in part answered this contention above, in that we found the evidence sufficient to sustain the findings of the chancellor that the wife's misconduct constituted constructive desertion. Suffice it to say that this court has held on numerous occasions that the conduct of one spouse which compelled the other to leave the home may justify a divorce to the latter on the ground of desertion, even though the conduct may not justify a divorce on the ground of cruelty. *Ritz v. Ritz, supra; Robertson v. Robertson,* 187 Md. 560, 51 A. 2d 73; *Miller v. Miller, supra; Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455; *Kruse v. Kruse, supra.* See 19 A.L.R. 2d, *Constructive Desertion,* 1428, 1436.

The appellant also contends insufficient corroboration, condonation and provocation. We need not set out in detail the testimony of the corroborating witnesses. Suffice it to say that a review of the record satisfies us that there was sufficient corroboration in a case such as this which was hotly contested, so as to prevent collusion, and which substantiated the basis for the divorce. *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919; *Maranto v. Maranto,* 192 Md. 214, 64 A. 2d 144;

*Schriver v. Schriver,* 185 Md. 227, 44 A. 2d 479. Cf. *Ritz v. Ritz, supra.*

On the question of condonation, the record discloses that the appellant caused her bed to be moved from the bedroom in January 1960 and that the appellee and appellant did not cohabit after September 1960, which was around the time of two vicious assaults by the wife on her husband. The week before the husband left the home the last altercation occurred in which the wife ripped the appellee's back with her fingernails and tore his undershirt. We think there was sufficient evidence to overcome any inference of condonation and that the chancellor was warranted in concluding that her actions had not been condoned. *Sullivan v. Sullivan,* 223 Md. 74, 162 A. 2d 453; 32 A.L.R. 2d 107; Nelson, *Divorce and Annulment,* (2d ed.), Section 11:03; cf. *Hite v. Hite,* 210 Md. 576, 124 A. 2d 581; *Ritz v. Ritz, supra.*

As far as provocation is concerned, although we find the striking by the husband of his wife less than commendable, considering the circumstances and duration of his wife's misconduct over the years, we cannot say that this single act of violence of the husband justified her conduct, when in fact it was subsequent to many acts of misconduct by the wife. *Harrison v. Harrison,* 223 Md. 422, 164 A. 2d 901, and cases cited therein. Moreover, as was said in *Kruse,* where the same contention was made and rejected, "the Court does not find his conduct other than that which might be expected from a man whose patience was pushed to extremity."

Finally the appellant says that the chancellor was in error when he awarded the custody of Barbara, the four year old daughter, to the appellee. As in all custody cases the primary consideration is the best interest of the child. In the instant case both doctors indicated that the prognosis of the appellant was "guarded" and that any excessive stress is harmful to her. At times she is psychotic and out of touch with reality, has hallucinations which would affect the child. Moreover, Dr. Cavanagh stated that the "greatest harm to children is contact with a sick mother before they are five," and Dr. Santucci testified that the appellant "will have an effect" on the child and that the "child will tend to come in for more protection

than the ordinary child might \* \* \* and also the development of the tendency to blame other people for their faults." From this testimony and other evidence the chancellor concluded that the two older children, whose personality had been already formed and would not likely be affected by the appellant's sickness, should be awarded to the appellant; but because of the tender age of Barbara and the appellant's "mental disorder", he reasoned that the best interests of the youngest child would be better served if the custody of the child were awarded to the appellee. The chancellor recognized the fact that this court has frowned upon split custody, *Roussey v. Roussey,* 210 Md. 261, 264, 123 A. 2d 354, but, under the circumstances and Barbara's age, found it proper to make such a provisional disposition, *Kerger v. Kerger,* 156 Md. 607, 145 Atl. 10. We concur in his solution of the problem. The chancellor saw and heard the testimony of the other witnesses, in addition to that of the psychiatrists, which indicated that some detrimental effect would flow from the child living with the appellant while she is in her present condition. Having the opportunity to evaluate what was best for the child, the relative stability, sincerity, and credibility of the parties, we cannot find that he abused his discretion or that his conclusion on the facts was clearly wrong. *Wood v. Wood,* 227 Md. 112, 175 A. 2d 573.

Finding no error in the court's conclusions and the decree below, we must affirm.

*Decree affirmed, costs to be paid*
*by the appellee.*