764 A.2d 844

**In re TAMARA R.**

**No. 275, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 29, 2000.

Seri A. Wilpone, Hughesville, for appellant.

Mary M. Pizzo, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellee.

Argued before HOLLANDER, THIEME* and ADKINS, JJ.

---

\* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

ADKINS, Judge.

In this appeal we are asked to decide the jurisdiction of the juvenile court to grant sibling visitation in a CINA proceeding, and to balance the sibling's need for visitation against the constitutional rights of a parent who opposes it. Tamara R. ("Tamara"), appellant, a child found to be in need of assistance ("CINA"), petitioned the juvenile court for visitation with her brother and her half-sister, who remained in the care and custody of their father and have never been found to be in need of assistance.[1] On appeal, appellant contends that the Circuit Court for Saint Mary's County, sitting as a juvenile court, erred in ruling that (1) it did not have jurisdiction to entertain her petition for visitation; and (2) a grant to Tamara of the right to visit with her siblings would unduly interfere with the constitutional right of her father to raise his other children as he saw fit.

## FACTS AND LEGAL PROCEEDINGS

On August 11, 1999, the Saint Mary's County Department of Social Services ("DSS"), filed a petition alleging that Tamara, age 14, was a CINA. The petition was based on Tamara's allegations of sexual abuse by her father. Before the September 22, 1999 adjudication hearing, Tamara recanted, and then reasserted her allegations of sexual abuse. At the hearing before a master, the allegations of sexual abuse were not resolved because the parties agreed that appellant was a CINA due to "the special needs of the child and parent/child conflict."

A disposition hearing was held on November 17, 1999. At the hearing, the master recommended that DSS be given care

---

1. Tamara's half-sister, Mary, is the child of her father, Mr. R. Mary resides with Mr. R. and her mother, wife of Mr. R., who was not a party to the proceeding. Mr. R. had sole custody of Tamara's brother, Jonathan. There is little or no mention in the record regarding the mother of Tamara and Jonathan, who is not a party. Although we hold that Mrs. R., as the custodial parent of Mary, is a necessary party under Rule 2–211(a), see infra, we make no ruling regarding whether the non-custodial mother of Tamara and Jonathan is a necessary party.

and custody of Tamara and that DSS should facilitate an appropriate schedule for Tamara to visit with her siblings. On December 8, 1999, the master recommended that Tamara "have visitation with her siblings twice a month. . . ." Tamara's father timely noted exceptions to this recommendation. The father contended, *inter alia,* that the juvenile court lacked jurisdiction over appellant's siblings because they were never adjudicated CINA, and that a grant of visitation would interfere with his constitutional rights to raise his own children as he saw fit.

On February 11, 2000, a hearing was held on the father's exceptions. During the hearing, exhibits were introduced into evidence that indicated that it would be beneficial for appellant to have visitation with her siblings. Tamara's therapist reported:

Given [the] allegations of sexual abuse and the resulting circumstances, it is my impression that Tamara is experiencing a great deal of anger, sadness, betrayal and confusion. She has lost daily contact with her nuclear family, and she especially misses interacting with her siblings. Since Tamara has not been able to see her brothers and sister regularly, she misses them very much, which has further contributed to her feelings of depression and isolation. I believe it would be to Tamara's therapeutic benefit to have regular visitation with her siblings; the regular contact with them would provide her with some of the family interaction she has lost, and would help her by supporting the continuation of the sibling relationship.

The court, however, did not address the merits of Tamara's petition for visitation because it ruled that (1) it did not have jurisdiction over appellant's siblings; and (2) an order for visitation would interfere with the constitutional rights of Mr. R.

[T]here is no authority to exercise and extend the jurisdiction [of the juvenile court] over siblings who are not already before the Juvenile Court under any proceedings . . . the siblings being the ones who [appellant] wishes to visit with.

The [c]ourt further finds that the extension of jurisdiction to allow the [c]ourt to order visitation ... would undermine clearly ... the relationship between the [appellant], and her father and the entire family unit by ... forcing a parent who is otherwise raising his children as he sees fit, [and to order visitation] would indicate that this is not in the best interest of the whole family unit, and that is what this is all about. And the [c]ourt, therefore, cannot, under any existing law or authority in this case, I think there are serious constitutional questions as to [the father's] right under these proceedings and in this particular environment.... Yes, there is a provision in the law that allows a petition by any sibling to have visitation with another, but that has to be generated by the siblings [not adjudicated CINA].... In this case it is not. And it flies in the face of this family unit and trying to get this family back together.... In this [c]ourt's opinion there is no justification legally to court order and force the visitation of minor children who are in the custody of a parent who is presumed to be raising them in the manner in which he sees fit....

Additional facts will be added as necessary to our discussion.

## DISCUSSION

Tamara contends that the juvenile court erred in ruling that it did not have jurisdiction, and that granting visitation rights would not interfere with her father's constitutional rights as a parent. We agree that the juvenile court did have jurisdiction, and conclude that Mr. R.'s constitutional rights as a parent would not necessarily have been interfered with by a grant of visitation.

### A.

### Jurisdiction Of Juvenile Court

Tamara relies on Md.Code (1984, 1999 Repl.Vol.), Section 5–525.2 of the Family Law Article ("FL"), which provides:

(a) *Petition for visitation rights.*—Any siblings who are separated due to a foster care or adoptive placement may petition a court, including a juvenile court with jurisdiction over one or more of the siblings, for reasonable sibling visitation rights.

(b) *Role of court.*—If a petitioner under this section petitions a court to issue a visitation decree or to amend an order, the court:

    (1) may hold a hearing to determine whether visitation is in the best interest of the children;

    (2) shall weigh the relative interest of each child and base its decision on the best interest of the children promoting the greatest welfare and least harm to the children; and

    (3) may issue an appropriate order or decree.

Tamara contends that section 5–525.2 confers jurisdiction upon the juvenile court in this instance. Mr. R., on the other hand, contends that "a much sounder interpretation of the statute would deem that it is designed to 'provide a mechanism for interested non-[party] siblings who have a sibling under the jurisdiction of the [j]uvenile [c]ourt ... to file in that child's CINA case and ask the court to give them visitation.'"

The cardinal rule in statutory construction is to ascertain and carry out the true intention of the legislature. *See Hyle v. Motor Vehicle Admin.,* 348 Md. 143, 148, 702 A.2d 760 (1997). In determining legislative intention, we look to the general purpose, aim, or policy behind the statute. *See Condon v. State–Univ. of Maryland,* 332 Md. 481, 491, 632 A.2d 753 (1993). Ordinarily, we look to the words of the statute to determine its intent. *See Gordon Family P'ship v. Gar on Jer,* 348 Md. 129, 137, 702 A.2d 753 (1997). "On the other hand, while the language of the statute is the primary source for determining the legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body." *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590 (1992). Indeed, a

statute's purpose " 'is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' " *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514, 525 A.2d 628 (1987) (quoting *United States v. Whitridge,* 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905)). We will not interpret a statute in isolation; but rather, we will look to the statutory scheme as a whole because legislative intention "is to be discerned by considering [a statute] in light of the statutory scheme." *GEICO v. Ins. Comm'r,* 332 Md. 124, 132, 630 A.2d 713 (1993). In this instance, we find that the plain language and the statutory purpose are consistent, and that both support Tamara's position that the juvenile court has jurisdiction to consider her petition for visitation with her siblings.

■ Section 5–525.2 gives a juvenile court jurisdiction to decide visitation rights with siblings who are separated if it has jurisdiction "over one or more of the siblings." Here, the juvenile court had jurisdiction over Tamara. A plain reading of the statute causes us to reject the limitation requested by appellee—that the court must have jurisdiction over the sibling being visited, rather than the sibling petitioning for visitation. Had the legislature intended to so limit jurisdiction, it would have placed the words "with the sibling or siblings adjudicated CINA" at the end of subpart (a) of section 5–525.2, following "for reasonable sibling visitation rights." In the absence of such language, the plain meaning of the words is that siblings who are separated by foster care or adoptive placement may petition for visitation with each other, regardless of whether they have all been adjudicated CINA.

Appellee argues that the legislative history reported in the *Session Review,* a summary of the legislative session prepared by the Department of Legislative Reference, supports its view that in order for the juvenile court to order that a child be visited without the child requesting it, the court must have adjudicated the child a CINA. He relies on the italicized language in the following excerpt from the *Session Review:*

Under current law, an equity court has broad authority to grant visitation rights to any person in an appropriate case. There is apparently some confusion as to whether this authority extends to [the] juvenile court. This bill is intended to clarify that *when a juvenile court has jurisdiction over children,* the court may grant reasonable sibling visitation rights if it is in the best interest of the children.

Department of Legislative Reference, *Legislative Session Review,* 1994, p. 211 (emphasis added). We do not read the *Session Review* in the same manner as appellant. The *Session Review* simply makes a general statement referring to "children" under the court's jurisdiction, and makes no particular comment on whether all of the children must be adjudicated CINA before the court can entertain a visitation order. We do not see the language in the *Session Review* as inconsistent with the clear language of section 5–525.2, allowing such visitation when there is jurisdiction over "one or more of the siblings."

Mr. R. further argues that interpreting section 5–525.2 to confer jurisdiction in this case is inconsistent with the statute conferring general jurisdiction for juvenile courts. Relying on Md.Code (1974, 1998 Repl.Vol.), section 3–804 of the Courts & Judicial Proceedings Article ("CJ"), he contends that under section 3–804, the only way a juvenile court can obtain jurisdiction is by a petition asking the court to adjudicate the child as delinquent, in need of supervision, or in need of assistance.[2] Because there has been no such petition with respect to Mary

---

2. This section provides in pertinent part:
   (a) *Child alleged to be delinquent, in need of supervision or assistance or with citation for violation; termination of parental rights and related adoption proceedings.*—The court has exclusive original jurisdiction over:
   (1) A child alleged to be delinquent, in need of supervision, in need of assistance or who has received a citation for a violation; and
   (2) With respect to any child who is under the jurisdiction of the juvenile court and previously has been adjudicated a child in need of assistance, all termination of parental rights proceedings and related adoption proceedings.
   CJ § 3–804(a).

and Jonathan, he contends, the juvenile court does not have the jurisdiction to subject them to a visitation order.

Mr. R.'s approach takes an unduly narrow view of a juvenile court's role with respect to the family once it has acquired jurisdiction over a CINA child, and ignores the traditional role of children in a custody or visitation proceeding. In a family law proceeding that does not involve a CINA, the children are not required to be parties when custody or visitation is decided. *See Auclair v. Auclair,* 127 Md.App. 1, 13, 730 A.2d 1260 (1999). The court must focus on the best interests of the children. Unless a guardian *ad litem* is appointed, the children's interests are presumed to be represented by their respective parents. *See Smith v. Organization of Foster Families for Equity & Reform,* 431 U.S. 816, 841, n. 44, 97 S.Ct. 2094, 2108 n. 44, 53 L.Ed.2d 14 (1977) ("[children's] interest is ordinarily represented in litigation by parents or guardians"). The children's status should be no different when a juvenile court is given jurisdiction to decide a visitation matter concerning a child adjudicated a CINA. In a CINA proceeding, the CINA's parent is a party. *See* CJ § 3–801(r) (the definition of "party" includes the child's parent). As the parent of Jonathan and Mary, Mr. R. was in a position to advance any arguments that the visitation with Tamara was not in their best interests. There is no requirement in the statute or otherwise in law that Jonathan and Mary be adjudicated CINA before the juvenile court can issue an order directing their father to allow visitation with them.

Mr. R. argues that because his wife ("Mrs. R."), Tamara's step-mother and the mother of Mary, is not permitted to be a party to a juvenile court proceeding, the question of visitation should be decided by an equity court, which would permit her intervention. This contention misses the mark. Mrs. R., as Mary's parent, has a constitutionally protected interest in the issue of whether or not visitation with Mary is permitted, and on what terms. *See Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 2062, 147 L.Ed.2d 49 (2000). Thus, she has a right to intervene in the proceedings. *See In re*

*Adoption/Guardianship No. 6Z970003,* 127 Md.App. 33, 50, 731 A.2d 467 (1999), *overruled in part on other grounds, In re Adoption/Guardianship No. T97036005,* 358 Md. 1, 746 A.2d 379 (2000) (child has right to due process hearing in proceeding to terminate his parent's rights because he has constitutional liberty interest in relationship with parent); Md. Rule 2–214(a)(intervention of right). In fact, Mrs. R. is a necessary party with respect to any order addressing visitation with Mary. *See Fairbanks v. McCarter,* 330 Md. 39, 45, 622 A.2d 121 (1993) [3]; Md. Rule 2–211(a) (required joinder of parties).

The authority of the juvenile court to issue an order "directing, restraining, or otherwise controlling the conduct of a person who is properly before the court" is set forth in CJ section 3–827. The juvenile court has such authority if it finds, *inter alia,* that the order "will assist in the rehabilitation of or is necessary for the welfare of the child." *Id.* at § 3–827(1)(iii). We reject Mr. R.'s argument that Mrs. R. could not be a person "properly before the court," because we think that Family Law section 2–525.2, and her interest in the subject matter of visitation with her daughter qualify her for that status, provided that she is properly served or she voluntarily appears in the case.

The limitation urged by Mr. R. on the jurisdiction of the juvenile court in matters of sibling visitation would diminish the ability of the juvenile court to grant full protection and services to a CINA child, and is not justified by any provision in the Juvenile Causes subtitle. *See* CJ § 3–801, *et seq.* The Juvenile Causes subtitle, by its terms, "shall be liberally construed to effectuate [its] purposes." CJ § 3–802(b). Under section 3–820(c)(1), "in making a disposition on a petition, the [juvenile court] may ... order the child, parents, guardian or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family." Clearly, the juvenile court is directed to consider the best

---

**3.** In *Fairbanks,* the Court of Appeals held that a mother who had joint legal custody but not physical custody of a child was a necessary party to a suit by her parents, grandparents of the children, for visitation with the children. *Fairbanks,* 330 Md. at 45, 622 A.2d 121.

interests of both the child adjudicated a CINA, as well as the other children in the family. The specific delineation of authority for the juvenile court to award visitation with siblings added by the 1994 enactment of section 5–525.2 of the Family Law Article is consistent with section 3–820(c)(1) of the Courts and Judicial Proceedings Article governing remedial services in the best interest of the entire family. It is also consistent with section 5–313(c)(2)(iii) of the Family Law Article, which provides that in terminating parental rights, the court must make findings on several enumerated factors, including "the child's feelings toward and emotional ties with . . . the child's siblings."

For the above reasons, we hold that the trial court erred in holding that it did not, sitting as a juvenile court, have jurisdiction to consider Tamara's petition to visit with her siblings who remained within the custody and control of her father, Mr. R.

## B.

### Mr. R.'s Constitutional Rights As A Parent

The trial court also concluded that, even if it had jurisdiction, it would be improper to exercise it because "there is no justification legally to court order and force the visitation of minor children who are in the custody of a parent who is presumed to be raising them in the manner in which he sees fit." We interpret the court's ruling to be addressing Mr. R.'s constitutional rights as a parent, and Mr. R., who agrees with this interpretation, urges that we affirm the trial court on this alternative ground.

We cannot evaluate this issue without examining the Supreme Court's recent decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). *Troxel* involved the constitutionality of court-ordered grandparent visitation with grandchildren, and held unconstitutional a "breathtakingly broad" Washington statute which allowed "any person [to] petition the court for visitation rights at any time," and premised resolution of such petitions upon "the best interest of the child." *Id.* at 2061. The court's rationale in that

decision, enunciated by a plurality opinion written by Justice O'Connor, raises, but does not resolve, questions about court-ordered visitation with a minor child by a sibling. Although, as we discuss *infra*, sibling visitation raises some different concerns from grandparent visitation, the concerns regarding a parent's constitutional rights to make decisions regarding his or her children are common to both.

The *Troxel* Court reviewed extensive precedent regarding parental rights and concluded that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 2060. Resting on this principle, the Court found the Washington statute unconstitutional, assigning several reasons. First, it held that in the absence of an allegation that Granville was an unfit parent, the presumption that fit parents act in the best interests of their children must be applied. *See id.* at 2061. The Court further explained that "[t]he problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests." *Id.* at 2062. Indeed, the trial court "applied exactly the opposite presumption," *id.*, placing the burden on the parent to show that visitation would have an adverse impact on the children. Regarding the importance of the parent's decision, the Court said:

> In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.

*Id.*

The Supreme Court also found significant that there was no allegation that Granville ever sought to cut off visitation entirely. Rather, Granville only sought to restrict grandparent

visitation to one short visit per month and special holidays. Examining the facts of the case, the Court found that the trial court's order "was not founded on any special factors that might justify the State's interference with Granville's fundamental right to make decisions concerning the rearing of her two daughters." *Id.* at 2061. It observed that the trial court

made only two formal findings in support of its visitation order. First, the Troxels 'are part of a large, central, loving family, all located in this area, and the [Troxels] can provide opportunities for the children in the areas of cousins and music.' Second, 'the children would be benefitted from spending quality time with the [Troxels], provided that time is balanced with time with the childrens' [sic] nuclear family.' These slender findings, in combination with the court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to Granville's already having offered meaningful visitation to the Troxels, show that this case involves nothing more than a simple disagreement between the [trial court] and Granville concerning her children's best interests.

*Id.* at 2063.

The Supreme Court signaled that its decision might have been different had either the statute or decisional law required something more than a mere disagreement between the parent and the court about what was better for the child:

[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made. Neither the Washington nonparental visitation statute generally—which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the [trial court] in this specific case required anything more. Accordingly, we hold [the Washington statute], as applied in this case, is unconstitutional.

*Id.* at 2063–64. It also did not, and considered that it "need not, define . . . the precise scope of the parental due process right in the visitation context." *Id.* at 2064.

Significantly for our decision in this case, the Supreme Court declined to decide that all non-parental visitation statutes are unconstitutional on their face. Instead, the plurality opinion cautiously stated:

> We agree with Justice Kennedy [4] that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied. . . . Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter. *See, e.g., Fairbanks v. McCarter,* 330 Md. 39, 49–50, 622 A.2d 121 (1993).

*Id.* at 2064. We read the opinion to say that if there are sufficient standards for courts to apply in evaluating a non-parent's claim for visitation, and if those standards include sufficient deference to the parent's determination, non-parental visitation statutes may be constitutional. The standards set by our Court of Appeals for non-parental visitation are found in *Fairbanks,* cited in *Troxel.* We turn next to examine the *Fairbanks* standards in light of *Troxel.*

*Fairbanks,* like *Troxel,* involved grandparent visitation. Under Maryland's original grandparent visitation statute that the *Fairbanks* Court construed, Maryland Code (1984, 1991 Repl.Vol.), section 9–102 of the Family Law Article, a Maryland court could

(1) consider a petition for reasonable visitation by a grandparent of a natural or adopted child of the parties whose marriage has been terminated; and

(2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.[5]

---

4. Justice Kennedy wrote a dissenting opinion, in which Justices Stevens and Scalia joined.

5. Section 9–102 was later revised to delete the requirement that there be a termination of a marriage before grandparent visitation could be considered. *See* 1993 Md. Laws, Ch. 252.

The Court of Appeals enumerated factors that a trial court should consider in deciding what constitutes the best interests of the child:

> As a general proposition, visitation awarded to adults is not for their gratification or enjoyment, but to fulfill the needs of the child. The trial court must concern itself solely with the welfare and prospects of the child. In so doing, the court should assess in their totality all relevant factors and circumstances pertaining to the grandchild's best interests. These would include, but not be limited to: the nature and stability of the child's relationships with its parents; the nature and substantiality of the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together, the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family; the physical and emotional health of the adults involved; and the stability of the child's living and schooling arrangement.

*Id.* at 49–50, 622 A.2d 121 (citations omitted).

The Supreme Court's citation of *Fairbanks* as an example of "state-court adjudication [occurring] on a case-by-case basis" that might be acceptable, suggests to us that the above factors might be sufficient to remove *Fairbanks* from the category of cases whose disposition rests on "a simple disagreement between the [trial court] and [the parent] concerning [the child's] best interests." *Troxel,* 120 S.Ct. at 2063. *Troxel* does seem to require, however, that we superimpose upon these factors some deference to the parent's determination of what is in the child's best interest. The best way to do this, we believe, is to apply a presumption that the parent's decision to decline visitation is in the best interest of the child over whom the parent has custody, and to place the burden on the non-parent seeking visitation to rebut that presumption. This presumption would be similar to the one we applied in determining a visitation schedule. In *Wolinski v. Browneller,* 115 Md.App.

285, 693 A.2d 30 (1997), Judge Davis, writing for this Court, held that a

> parent's proposed schedule of visitation is entitled to a presumption that it is in the best interests of the child. . . . [P]roper regard for a parent's constitutional rights requires that the burden to produce testimony or other evidence discrediting a parent's proposed visitation schedule be placed upon the grandparents who petition for vested visitation rights. Simply to ignore a parent's wishes regarding the time his or her child should spend outside the family home, and outside of his or her immediate care and custody, is to trample improperly on the parent's liberty interest in directing the upbringing of his or her child. Nevertheless, in light of the State's compelling interest in protecting the child's welfare and the minimal severity of the intrusion upon parental rights, the presumption in favor of appellant's schedule may be rebutted by affirmative evidence that the schedule would be detrimental to the child's best interests.

*Id.* at 319, 693 A.2d 30.

In *Wolinski,* the parent conceded that the decision whether to visit did not require a presumption in favor of the parent, but instead sought only a presumption in favor of the parent's proposed schedule of visitation. *Id.* at 317–18, 693 A.2d 30. In the instant case, no similar concession has been made, and thus we are faced with the issue of whether Mr. R.'s opposition to visitation is entitled to a presumption that denial of visitation is in the best interests of the children over whom he has custody. We think *Troxel* compels the court to apply a rebuttable presumption in favor of parents who oppose a non-parent's petition for visitation with their custodial children. *See Troxel,* 120 S.Ct. at 2063–64. By deciding that Mr. R.'s constitutional rights were violated without considering the evidence other than Mr. R.'s opposition to visitation, the trial court effectively created an irrebuttable presumption that visitation was not in the best interests of the children. In doing so, it erred. If there was sufficient evidence to rebut the presumption that visitation was in the children's best

interests, then we must reverse and remand for the court to consider that evidence in making its determination.

Before we review the evidence, we must return to *Troxel*, to consider an issue raised, but not answered, by the Supreme Court. There, the Washington Supreme Court held the Washington grandparent visitation statute unconstitutional, *inter alia*, because the "Constitution permits a State to interfere with the right of parents to rear their children only to prevent harm or potential harm to a child." *Troxel*, 120 S.Ct. at 2058. The Supreme Court, however, explicitly refused to consider the question of "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Id.* at 2064. The *Troxel* Court was referring to harm to the child being visited, who was a child in the custody and care of the parent who opposed visitation by the non-parent. Our picture is more complex, for here we are addressing harm and benefit to two categories of children—the child seeking visitation, and the children she would like to visit. We do not need to address the exact question left unanswered by the Supreme Court, because, as we shall explain, there is sufficient evidence of harm to Tamara from the denial of visitation. We do, however, face the question of whether potential harm must be shown to both children in order to override a parental opposition to sibling visitation. We conclude that the State's interest in the protection of a minor child who has been removed from her parent's care is sufficiently compelling to justify over-riding her parent's opposition to visitation with her sibling, if there is evidence that denial of sibling visitation would harm the minor child who is separated from her family; it is not necessary that denial of visitation also would harm the siblings whom the separated child seeks to visit. *Compare In Re Adoption/Guardianship No. 93321055/CAD*, 344 Md. 458, 492–493, 495, 687 A.2d 681 (1997) (state has compelling interest in securing physical and emotional sustenance for children who are in state custody because of parent's or parents' inability or unwillingness to care for them), *with Brice v. Brice*, 133

Md.App. 302, 309–10, 754 A.2d 1132 (2000) (denying court-ordered grandparent visitation based on *Troxel* when custodial mother approved schedule of visitation without court order and no harm to child shown).

To evaluate the nature of the injury to Tamara from denial of visitation with her siblings, we first consider the importance of the sibling relationship and sibling visitation. Maryland courts have not specifically addressed the issue of sibling visitation. Courts in other jurisdictions, however, have recognized that sibling visitation may be beneficial and in the best interest of a child. In *L. v. G.,* 203 N.J.Super. 385, 497 A.2d 215 (Ch. Div.1985), emancipated siblings of two minors petitioned the court for visitation. At the time they filed suit, the adult siblings were only permitted to visit the minors in the home of their father and stepmother. Although, based on the facts of the case, the court refused to award visitation that occurred outside of the father's and stepmother's home, it did recognize the strong and singular value of the sibling relationship. It explained:

> Surely, nothing can equal or replace either the emotional and biological bonds which exist between siblings, or the memories of trials and tribulations endured together, brotherly or sisterly quarrels and reconciliations, and the sharing of secrets, fears and dreams. To be able to establish and nurture such a relationship is, without question, a natural and inalienable right which is bestowed upon one merely by virtue of birth into the same family.

*Id.* at 218. The New Jersey court went on to conclude:

> The relationship between a child and his/her siblings is a significant and unique one, from which a myriad of benefits and experiences may be derived. The bonds which develop between brothers and sisters are strong ones, and are, in most cases, irreplaceable.... Therefore, this [c]ourt finds that siblings possess the natural, inherent and inalienable right to visit with each other.

*Id.* at 222.

The benefits from a continued sibling relationship were also recognized by the Supreme Court of West Virginia in *Honak-*

*er v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989). In *Honaker,* a child's natural parents had divorced, with her mother having custody and the father afforded reasonable visitation. The mother subsequently remarried and had another child with her new husband. After the mother was killed in an automobile accident, the child's natural father and stepfather each sought custody. The court ultimately awarded custody to the natural father. Nevertheless, the court held that the child should have continued visitation with her half-brother. In doing so, the court ruled that sibling visitation would be in the child's best interest because taking away her contact with her half-brother "would be detrimental to her stability and well-being, as well as to [her half-brother's]." *Id.* at 326. *See also In Matter of Astonn H.,* 167 Misc.2d 840, 635 N.Y.S.2d 418, 424 (N.Y.Fam.Ct.1995) (visitation with half-sibling ordered).

Although, as we indicated, Maryland courts have not yet addressed the issue of sibling visitation, they have frequently expressed the view that "[o]rdinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof." *Hild v. Hild.* 221 Md. 349, 359, 157 A.2d 442 (1960). *See also Melton v. Connolly,* 219 Md. 184, 190, 148 A.2d 387 (1959); *Roussey v. Roussey,* 210 Md. 261, 264, 123 A.2d 354 (1956); *Hadick v. Hadick,* 90 Md.App. 740, 748, 603 A.2d 915, *cert. denied,* 327 Md. 626, 612 A.2d 256 (1992).[6] In *Obey v. Degling,* 37 N.Y.2d 768, 375 N.Y.S.2d 91, 337 N.E.2d 601 (1975), the New York Court of Appeals expressed a similar view regarding division of siblings:

---

**6.** In special circumstances, Maryland courts have approved the separation of siblings. *See, e.g., Davis v. Davis,* 280 Md. 119, 131, 372 A.2d 231 *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied,* 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978)(division of custody appropriate where youngest child had resided for two years with the mother without her siblings); *Bryce v. Bryce,* 229 Md. 16, 26–27, 181 A.2d 455 (1962) (division approved where one parent suffering from mental disease that may have had detrimental effect on 4 year old, but not on older children).

Young brothers and sisters need each other's strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful. The importance of rearing brothers and sisters together, and thereby nourishing their familial bonds, is also strengthened by the likelihood that the parents will pass away before their children.

*Id.* at 771, 375 N.Y.S.2d 91, 337 N.E.2d 601. *See also* Note, "Do Siblings Possess Constitutional Rights?," 78 Cornell L.Rev. 1187 (1993).

Some courts have considered the sibling relationship so important that they have held the right to associate with one's sibling to be a constitutional right. In *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir.1982), the Second Circuit considered Mrs. Rivera's claim that her due process rights were violated when the state removed her half-brother and sister from her custodial care as a foster parent. Ruling for Mrs. Rivera, the court recognized that, although foster parents usually do not have the right to due process protection, Mrs. Rivera's status as the half-sister of the minor children, along with her history of caring for them as a surrogate mother for several years, accorded her "an important liberty interest in preserving the integrity and stability of her family.... Custodial relatives like Mrs. Rivera are entitled to due process protections when the state decides to remove a dependent relative from the family environment." *Id.* at 1024–25. The Second Circuit also recognized "important interests that [the children] maintain in preserving the integrity and stability of their extended family. The ... children surely possess a liberty interest in maintaining, free from arbitrary state interference, the family environment that they have known since birth." *Id.* at 1026.

In *Aristotle P. v. Johnson*, 721 F.Supp. 1002 (N.D.Ill.1989) the plaintiffs were children who had been removed from their homes and were under the guardianship of the Illinois Department of Children and Family Services ("DCFS"), whose director was the defendant. The plaintiffs challenged the defendant's "practices of placing siblings in separate foster homes or residential facilities and denying the plaintiffs the opportu-

nity to visit their sisters and brothers who are placed else-where." *Id.* at 1004. In ruling for the plaintiffs, the court found "that the children's relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State.' "[7] *Id.* at 1005 (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).[8] Other decisions, some decided before *Roberts,* have declined to hold that there are constitutional grounds for protecting the sibling relationship. *See, e.g., Ken R. v. Arthur Z. and Mary Jane Z.,* 546 Pa. 49, 682 A.2d 1267, 1271 (1996) (holding that under Pennsylvania statute, sibling had no stand-ing to sue for visitation with siblings, and rejecting claim that sibling relationship was constitutionally protected, but recog-nizing importance of relationship); *B.H. v. Johnson,* 715 F.Supp. 1387, 1397 (N.D.Ill.1989) (children in custody of social

---

7. The *Aristotle* court went on to say that "[t]he plaintiffs' relationships with their siblings are even more important because their relationships with their biological parents are often tenuous or non-existent." *Aristotle P.,* 721 F.Supp. at 1006. It concluded that "[t]he defendants' policies, which allegedly infringe on the plaintiffs' constitutionally pro-tected right to associate with their siblings, must be evaluated under a heightened level of scrutiny." *Id.* The court distinguished a Seventh Circuit decision, *Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir.1984), which held that the plaintiffs could not bring a civil rights action under 42 U.S.C. § 1983 for damages caused by the loss of their siblings' society and companionship under similar circumstances, on the grounds that the *Bell* court stated that the Fourteenth Amendment could be used to strike statutes which sever relationships between siblings, and that *Bell* did not address *Roberts,* which was decided two months previously. *Aristotle P.,* 721 F.Supp. at 1006.

8. *Roberts* did not directly address sibling relationships, but discussed the constitutional right of association with family members:

The personal affiliations that exemplify these considerations, and that therefore suggests some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, the raising and education of children, and cohabitation with one's relatives. Fami-ly relationships, by their nature, involve deep attachments and commit-ments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.
*Roberts,* 468 U.S. at 619–20, 104 S.Ct. at 3250 (citations omitted).

services department were not constitutionally entitled to require department to make efforts to ensure sibling visitation).

It is not necessary for us to decide, however, whether to take the step that the *Aristotle P.* and *Rivera* courts did in finding the sibling relationship deserving of constitutional protection, or if so, to what extent. It is enough for our purposes that we recognize that the sibling relationship has been widely recognized as an important one, which will be given significant consideration and protection by courts in cases involving the family. Recognizing the value in sibling relationships puts in perspective the importance of the evidence that Tamara would be harmed by the denial of sibling visitation.

The evidence reveals that Tamara is in a highly vulnerable and unfortunate situation, having been removed from her family because of her allegations that her father sexually abused her. Regardless of whether the alleged sexual abuse occurred, Tamara's relationship with her father is so full of conflict as to require their separation. Nor does she have a relationship with her mother, who apparently has been absent from her life for some time. She does not have a positive relationship with her step-mother. Her relationship with her siblings appears to be the only stable familial relationship that she has. Reports introduced into evidence stated that Tamara was experiencing "a great deal of anger, sadness, betrayal and confusion." Her absence from her brothers and sister "further contributed to her feelings of depression and isolation." Her therapist recommended that "it would be to Tamara's therapeutic benefit to have regular visitation with her siblings; the regular contact with them would provide her with some of the family interaction she has lost. . . ."

Given the importance the law attaches to the sibling relationship, we think that the evidence regarding the potential for harm to Tamara if she is cut off from visitation with her siblings could be sufficient to overcome the presumption favoring Mr. R.'s determination that visitation should not occur. The juvenile court did not reach the question of harm to

Tamara, and instead, held that it had no jurisdiction and that Mr. R.'s constitutional rights precluded Tamara's claim. We reverse the juvenile court, and will remand the case for a determination of the potential for harm to Tamara if the sibling relationship is not continued.

Tamara's well-being is not the only consideration. The general impact of visitation on Jonathan and Mary must be considered, including, *inter alia,* the impact that visitation is likely to have on their relationship with Mr. R. The impact of visitation on Mary's relationship with her mother should also be considered. Mrs. R. should be a party to these proceedings in order to protect her parenting interests.[9] After making appropriate factual findings, the trial court should decide whether the evidence of potential for harm to Tamara from the loss of a relationship with her siblings is sufficiently strong to outweigh the constitutionally protected interest of Mr. R. to make the decision against such visitation with his other children. Thus, the court ultimately must determine whether the potential harm to Tamara overcomes the presumption arising from Mr. R.'s determination that visitation is not in the best interests of Jonathan and Mary. In order to do so, the court should consider the nature and severity of the harm to Tamara if visitation is denied, as well as Mr. R.'s reasons for denying visitation.

**JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

9. The court must also consider Mrs. R.'s wishes regarding Tamara's request for visitation with Mary and apply the same rebuttable presumption in favor of Mrs. R.'s preference.